CENTEL COMMUNICATIONS COMPANY, INC., ET AL.,[1]
PETITIONERS v. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 7188-85, 12015-86,    Filed March 23, 1989.
12092-86.

*Frederic L. Hahn, Michael M. Conway, Jay H. Zimbler,* and *George R. Goodman,* for the petitioner in docket No. 7188-85.

*Kenneth R. Wynne* and *Sarah J. Stitt,* for the petitioners in docket No. 12015-86.

---

[1]The cases of the following petitioners have been consolidated: Lloyd K. Davis and Estate of Patricia W. Davis, Deceased, Lloyd K. Davis and Edward H. White III, Independent Coexecutors, and, Natalie T. Armstrong, formerly Natalie T. Grey, and Estate of Rex B. Grey, Deceased, Natalie Tandy Grey and Rex Oliver Grey, Independent Coexecutors, docket No. 12015-86; and Fisk Electric Co. and Subsidiary, docket No. 12092-86.

*Jasper G. Taylor III* and *Kenneth D. Goodman,* for the petitioners in docket No. 12092-86.

*Lawrence C. Letkewicz,* for the respondent.

PARKER, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax as follows:

| Petitioners | TYE | Amount |
|---|---|---|
| Centel Communications Co., | 12/31/79 | $ 34,101 |
| (docket No. 7188-85) | 3/24/80 | 542,756 |
| Lloyd K. Davis and Estate of Patricia W. Davis, Deceased, Lloyd K. Davis and Edward H. White III, Independent Coexecutors (hereinafter individually and collectively referred to as Lloyd K. Davis, or Davis) (docket No. 12015-86) | 12/31/80 | 443,812 |
| Natalie T. Armstrong, formerly Natalie T. Grey, and Estate of Rex B. Grey, Deceased, Natalie Tandy Grey and Rex Oliver Grey, Independent Coexecutors (hereinafter individually and collectively referred to as Rex B. Grey, or Grey) (docket No. 12015-86) | 12/31/80 | 388,545 |
| Fisk Electric Co. and Subsidiary (docket No. 12092-86) | 12/31/80 | 285,752 |

The deficiencies relate to the issuance by Fisk Telephone Systems, Inc. (predecessor in interest to petitioner Centel Communications Co.) to certain of its shareholders (petitioners Lloyd K. Davis, Rex B. Grey, and Fisk Electric Co.) of certain warrants to purchase Fisk Telephone Systems, Inc. common stock. The issues for decision are:

(1) Whether the stock warrants were issued "in connection with the performance of services" within the meaning of section 83;[2] and,

(2) If section 83 applies to the warrants, whether the warrants had a readily ascertainable fair market value at the time they were issued.

In these consolidated cases respondent, to protect the fisc, has taken inconsistent positions with respect to the different petitioners. With respect to petitioner Centel

___

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Communications Co., successor in interest to Fisk Telephone Systems, Inc., respondent determined that the stock warrants were not subject to section 83 and therefore disallowed the deduction taken under section 83(h) by Fisk Telephone Systems, Inc. With respect to petitioners Lloyd K. Davis, Rex B. Grey, and Fisk Electric Co., respondent determined that the warrants were subject to section 83 and that therefore these petitioners had additional income under section 83(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the two supplemental stipulations of facts, and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Lloyd K. Davis resided in Houston, Texas, at the time the Davis petition was filed in this case. Rex B. Grey is the deceased spouse of Natalie T. Armstrong, who is a petitioner in this case both individually and in her capacity as independent coexecutor of the estate of Rex B. Grey. Natalie T. Armstrong resided in La Grange, Texas, at the time the Grey petition was filed in this case. Petitioner Fisk Electric Co. and Subsidiary (Electric) is a Texas corporation with its principal office located in Houston, Texas. Centel Communications Co. (Centel) is a Delaware corporation with its principal office located in Chicago, Illinois.

Founded in 1913 by relatives of Lloyd K. Davis, Electric is engaged in the electrical contracting business, serving commercial, industrial, and residential markets. Davis and his family own a majority of the outstanding stock in Electric, and Davis has been Electric's president since 1954.

In the late 1960's, the Federal Communications Commission issued the Carter Phone decision, requiring telephone companies to connect to private telephone systems.[3] This decision allowed nontelephone companies to enter the "telephone interconnect business," which consists of the sale, leasing, installation, and maintenance of private and commercial telephone systems. After the Carter Phone decision

---

[3]See *Carter v. American Telephone and Telegraph Company,* 365 F.2d 486 (5th Cir. 1966), cert. denied 385 U.S. 1008 (1967).

was issued, petitioner Rex B. Grey, an executive of International Telephone and Telegraph (ITT) and a long-time personal friend of Davis, suggested to Davis that Electric start a telephone interconnect business. Grey's idea was for Electric to start and support the business and for Grey to retire from his position with ITT in Europe to work with the new enterprise. Pursuant to Grey's suggestion, in 1971 Electric organized Fisk Telephone Systems, Inc., a Texas corporation, to engage in the telephone interconnect business. On September 19, 1972, this Texas corporation was merged into Fisk Telephone Systems, Inc. (hereinafter Fisk Telephone or Telephone), a Delaware corporation. Until its acquisition by Centel on March 24, 1980, Telephone's principal place of business was in Houston, Texas, and its primary business was the sale, installation, leasing, and maintenance of commercial telephone systems.

In its early years Telephone struggled financially. The U.S. Corporation Income Tax Return (Form 1120) filed by Telephone for the taxable year ending December 31, 1972, showed a net loss of $157,188, of which $137,588 was attributable to its telephone interconnect operations.[4] For its taxable year ending December 31, 1973, Telephone's income tax return showed a consolidated net loss of $1,427,624, of which $1,312,419 was attributable to its telephone interconnect operations.

As of September 22, 1972, Telephone had 544,001 shares of common stock outstanding. Except for 10,000 shares received by Electric in exchange for 10,000 shares of Fisk Telephone Systems, Inc. (the Texas corporation), all of the Telephone common stock was sold for $1 per share. The stock was sold to certain key Telephone personnel, Electric, officers of Electric, Davis, Grey, relatives of Davis and Grey, and several prominent business people. Neither Telephone's common stock, nor any of its warrants or options,

---

[4]The corporate income tax returns filed by Telephone from 1972 through 1980 were consolidated returns. During these years, Telephone was the parent corporation to several wholly owned subsidiaries. All of these subsidiaries were in the telephone interconnect business except Audio-Video Designs, Inc., which was in the electrical contracting business. The action or inaction of these subsidiaries or the fact that Telephone had wholly owned subsidiaries is not relevant to the issues in this case. We mention the subsidiaries only in the context of identifying Telephone's net income or loss solely from its telephone interconnect operations.

including those received by Davis, Grey, and Electric, were ever actively traded in an established market.

In order to raise additional capital, 500,000 shares of Telephone common stock were offered for sale to Telephone's shareholders in 1973. Approximately 160,000 of these shares were sold to several of Telephone's shareholders for $1 per share, and 300,000 shares were issued to Electric in exchange for the cancellation of a $300,000 debt Telephone owed to Electric. As of September 7, 1973, Telephone had 970,000 shares of common stock outstanding. Telephone's three largest shareholders were Electric, Davis, and Grey who held 31 percent, 10 percent, and 6 percent of the shares, respectively.

Beginning in 1973, Telephone entered into a series of loan agreements to obtain additional funds that were essential for its operations. From 1973 to 1979, these loan agreements were with the Capital National Bank of Houston, and in 1979 and thereafter with the Texas Commerce Bank National Association. During these years, the balances of the bank loans to Telephone ranged in amount from approximately $1,500,000 to $4,500,000. Beginning with the initial loan agreement in September 1973, and continuing until March 24, 1980, petitioners Davis and Grey each executed continuing guarantees of the repayment by Telephone of the various bank loans and notes executed by Telephone under its loan agreements (the personal guarantees). With the exception of the period May 1976 to August 1977, the personal liability of Davis and Grey under the guarantees was limited to $500,000 each. The banks required the personal guarantees as a condition for making the loans to Telephone.

In addition to requiring the personal guarantees of Davis and Grey, the banks also required certain guarantees of Electric, referred to generally as "performance guarantees," before making the loans to Telephone. Specifically, the banks required Electric to execute an indemnity agreement in connection with the loans to Telephone. The indemnity agreement provided that Electric would guarantee the performance by Telephone of all of its duties and obligations under Telephone's lease agreements and maintenance agreements. Electric agreed to indemnify the bank for any

losses or expenses incurred by the bank from Telephone's failure to repay the loans because of the failure of Telephone's lessees to make payments to Telephone under its lease and maintenance agreements.

In addition to the performance guarantees, the banks also required Electric to execute a subordination agreement in connection with the loans to Telephone (the subordinations). Under the subordination agreement, Electric agreed to subordinate all of Telephone's indebtedness and obligations to Electric to Telephone's indebtedness to the bank. The amount subordinated by Electric depended on the bank loan currently outstanding at the time and ranged from $200,000 to $750,000 (plus further advances from Electric to Telephone).

The personal guarantees, performance guarantees, and subordinations were entered into by petitioners Davis, Grey, and Electric voluntarily and without the expectation of any compensation from Telephone. The minutes of the annual meeting of Telephone's board of directors held on December 13, 1973, stated:

> The directors took note of the fact that the Company's $500,000 note (bearing interest at 2 percent above prime and due in six months) to the Capital National Bank of Houston had been personally guaranteed by Lloyd K. Davis and Rex Grey, directors of the Company, who had executed the guarantees without any consideration or payment to them by the Company.

Davis and Grey gave their personal guarantees "to keep the company surviving, to keep it in operation." During 1974, the interconnect business started improving for Telephone. Even though its 1974 income tax return showed a consolidated net loss of $59,662, its telephone interconnect operations had a net income of $66,656. For the taxable years 1975 through 1979, Telephone had consolidated net income or (loss) of $352,103, ($29,283), $915,576, $969,517, and $1,674,405, respectively.

In early 1975, Grey approached Davis and suggested that he and Davis should have some additional stock in Telephone for the increased risk they each had assumed under the personal guarantees. Davis and Grey then took this idea to the Telephone board of directors. At the regular meeting of Telephone's board of directors held on January 12, 1975,

the board agreed "to work out a stock-option plan for Fisk Electric Company's investment, and for Lloyd Davis' and Rex Grey's guarantees on loans to Fisk Telephone Systems." However, no action was taken by the board regarding this agreement until 1978.

Davis had been a member of Telephone's board of directors since its inception and served as Telephone's president from 1972 through 1976. Thereafter, James A. Lovell, the former astronaut, served as Telephone's president. Grey served as Telephone's chairman of the board from 1975 through 1979. Davis and Grey's involvement in Telephone's day-to-day operations was limited, and both generally served Telephone only in a consulting capacity. Due to his extensive knowledge of the telephone business, Grey had more day-to-day contact with Telephone than Davis had. Grey was compensated by Telephone as a consultant and Davis was not. Grey received compensation from Telephone in the amounts of $4,500, $18,000, $18,000, $18,000, and $30,000 in the years 1975 through 1979, respectively. However, Davis and Grey were not employees of Telephone, and neither person could or did participate in Telephone's employee stock option plan.

On November 10, 1977, Telephone issued one million shares of convertible preferred stock to Electric in exchange for the cancellation of $1 million of advances previously made by Electric to Telephone. By its terms, the preferred stock could not be converted to cash or common stock prior to August 5, 1979. After August 5, 1979, Telephone could, at its option, redeem any of the preferred stock for cash at $1.30, $1.40, and $1.50 per share during the years ended August 5, 1980, August 5, 1981, and August 5, 1982, respectively. All unredeemed shares of the preferred stock outstanding on August 5, 1982, were to be automatically converted into the common stock of Telephone at 1.5 shares for each share of preferred stock. Electric continued to hold all of the preferred stock until it was exchanged in 1980 for $1,300,000 in connection with the acquisition of Telephone by Centel.

On March 3, 1978, Telephone's board of directors reviewed the minutes of the board meeting held on January 12, 1975, regarding the guarantees, subordinations, and

advances of funds that Davis, Grey, and Electric had provided. Warrants and other forms of compensation were discussed. In its regular meeting held on April 26, 1978, the board adopted a resolution authorizing the issuance to Davis, Grey, and Electric of warrants to purchase 50,000 shares of Telephone common stock each. On May 1, 1978, Telephone granted to each (Davis, Grey, and Electric) warrants to purchase 50,000 shares of Telephone common stock for $1 per share. The warrants could be exercised, in whole or in part, from time to time, at any time prior to May 1, 1982. The warrants were issued in consideration of, or in recognition of, the increased risks assumed by Davis, Grey, and Electric under the personal guarantees, performance guarantees, and subordinations. The members of Telephone's board understood that the percentage interests of the remaining shareholders would be diluted upon the exercise of the warrants, but the board members thought that Davis, Grey, and Electric were entitled to the warrants for the increased risks they had assumed.

On March 24, 1980, Centel acquired Telephone in a tax-free reorganization under section 368(a)(2)(D). As part of the merger, Telephone's shareholders of record on March 24, 1980, received their proportionate share of 820,000 shares of Centel common stock. On February 29, 1980, Davis, Grey, and Electric had exercised their Telephone stock warrants, each receiving 50,000 shares of Telephone common stock in exchange for $50,000. Following the exercise of the warrants, Telephone had 1,354,000 shares of common stock outstanding. Therefore, in connection with the merger each Telephone shareholder received .605613 shares of Centel common stock for each Telephone share held. As of February 29, 1980, and March 24, 1980, the closing price on the New York Stock Exchange of Centel common stock was $22.875 and $22.1659 per share, respectively.

Immediately subsequent to the merger, Centel agreed to have Davis, Grey, and Electric released from their obligations under the personal guarantees and performance guarantees. In the event that the releases could not be obtained, Centel agreed to indemnify Davis, Grey, and Electric with respect to these obligations.

Telephone filed its corporate income tax returns for the taxable years 1978, 1979, and the short taxable year ended March 24, 1980, with the Internal Revenue Service Center in Austin, Texas. On the return for the period ended March 24, 1980, Centel as the successor to Telephone decided to claim a deduction under section 83(h) attributable to the exercise of the warrants by Davis, Grey, and Electric. The deduction was initially computed as follows:

| | |
|---|---:|
| Telephone shares issued........................... | 150,000 |
| Exchange ratio ..................................... | .605613 |
| Centel shares....................................... | [1]90,845 |
| Fair market value per share ........................ | $22.1659 |
| | [1]2,013,665 |
| Less: Exercise price.............................. | (150,000) |
| | [1]1,863,665 |

[1]The parties stipulated to these figures which contain minor arithmetical errors.

On August 18, 1980, prior to the filing of Telephone's return for the period ended March 24, 1980, Centel's officers met to discuss this proposed $1,863,665 deduction under section 83(h). At this meeting Centel's officers decided to claim the deduction with respect to the warrants issued to Grey and Electric, but not to claim the portion of the deduction attributable to the warrants issued to Davis. The decision to forgo the deduction with respect to the Davis warrants was reached because Centel wanted "to retain Mr. Davis' goodwill and his potential for helping Fisk Telephone in its business, which [Centel] had just acquired." Centel's director of taxes at that time assured the other officers that Centel's position would not be jeopardized by postponing the deduction since it could be claimed on an amended return filed in a later year. Centel's officers agreed to reevaluate this decision annually to determine if Davis' goodwill and business potential justified continuing to forgo the deduction attributable to his warrants. The minutes of this August 18, 1980, meeting also indicated that two of Centel's officers were to advise Davis of the decision the following day and that "If Davis balks, we may also give on the deductions related to Grey and Fisk Electric." However, the record does not indicate that Davis was ever told that Centel intended to deduct two-thirds of the

warrants (those of Grey and Electric) or that Centel intended to claim any of the warrants as compensation paid by its newly acquired subsidiary, Telephone.[5]

In any event, Telephone claimed a deduction for two-thirds of the amount of $1,863,665, totaling $1,242,443, on its March 24, 1980, return. However, on March 4, 1982, Telephone filed an amended return for its taxable period ended March 24, 1980. In this amended return Telephone claimed an additional deduction of $621,222 for the remaining one-third of the warrants (Davis' warrants). As its explanation for claiming the $621,222 deduction, the amended return stated:

> Upon the filing of the original return, the taxpayer inadvertently failed to take into account the exercise of a group of stock warrants. The additional deduction shown on this amended return reflects the Section 83 deduction attributable to the exercised stock warrants not taken into account on the original return.

The statement that the taxpayer "inadvertently failed" to claim that group of warrants was untrue.

In his notice of deficiency to Centel (as successor in interest to Telephone) dated December 28, 1984, respondent determined that the warrants issued to Davis, Grey, and Electric in 1978 constituted a nondeductible constructive dividend to those shareholders in 1978 rather than deductible compensation for services performed. Accordingly, Telephone's claimed compensation deduction under section 83 of $1,863,665 ($1,242,443 on the original return plus $621,222 on the amended return) was disallowed in full.

Seidman and Seidman, Certified Public Accountants, of Houston, Texas, audited Electric's financial statements for the 2 years ended December 31, 1978. The notes to the financial statements made reference to Electric's receipt of the Telephone stock warrants in 1978. John Kamp, C.P.A., a tax partner at Seidman and Seidman for 25 years, prepared the 1978 Federal income tax returns for both Davis and Electric. Kamp was not involved in the audit of Electric's financial statements and had no knowledge of the Telephone stock warrants when he prepared these 1978 returns. These two returns, as well as Grey's 1978 return,

---

[5]As petitioners Davis, Grey, and Electric point out, Centel's action in regard to the warrants had the effect of reducing the effective purchase price Centel had to pay to acquire Telephone.

reported no income with respect to the receipt of the warrants.

In November 1980, Davis, Grey, and Electric each filed an amended income tax return for 1978. These amended returns stated that the respective taxpayers either "inadvertently omitted" (Davis and Electric) or "failed to include" (Grey) the value of the warrants on their respective 1978 returns. The record does not establish what prompted the filing of these amended returns. The amount reported on these amended returns was $35,000, computed on the basis of an appraisal of the warrants made by the firm of Underwood, Neuhaus & Co. of Houston, Texas. The appraisal report, dated September 16, 1980, opined that the fair market value of each warrant at April 30, 1978, was $0.70. Davis, Grey, and Electric did not report any income with respect to their exercise of the warrants on their respective 1980 Federal income tax returns.

In separate notices of deficiency dated February 3, 1986, respondent determined that Davis, Grey, and Electric had additional income in 1980 as a result of their exercise of the Telephone warrants. Respondent determined that under section 83, Davis, Grey, and Electric each had additional income in 1980 in the amount of $621,200, computed as follows:

| | |
|---|---|
| 50,000 shares received at $13.424 | $671,200 |
| Less: Exercise price | ( 50,000) |
| | 621,200 |

The fair market value of $13.424 was determined by respondent as follows:

$$\frac{820,000 \text{ shares of Centel stock}}{1,354,000 \text{ shares of Telephone stock}} \times \$22.1659 = \$13.424 \text{ per share of Telephone stock}$$

The determinations by respondent in the four notices of deficiency discussed above resulted in the deficiencies currently in dispute in this case. In order to avoid being "whipsawed," respondent has taken inconsistent positions with respect to petitioner Centel, on the one hand, and petitioners Davis, Grey, and Electric, on the other, as to the applicability of section 83. If we find that section 83 applies to the warrants, we must then decide whether the warrants

had a readily ascertainable fair market value when they were issued in 1978. In light of this contingent second issue, petitioner Centel and petitioners Davis, Grey, and Electric provided the Court with expert testimony (with accompanying written reports) as to whether the warrants had a readily ascertainable fair market value in 1978. The inquiry in these reports is whether the warrants had a readily ascertainable fair market value at the time they were issued.

Both experts had impressive professional backgrounds and significant experience in valuing stock in closely held corporations.[6] Both experts used an acceptable methodology.

Petitioner Centel's expert was Herbert T. Spiro, president of American Valuation Group, Inc. of Woodland Hills, California. In his attempt to determine whether the Telephone stock and the Telephone stock warrants had a readily ascertainable fair market value at their issuance, Spiro used the discounted cash-flow approach. This method entails analyzing the past performance of the subject business entity and then forecasting the likely future course that this business might take. First, annual forecasts of cash-flows are made for 10 years. Following this, an appropriate discount rate based on the risk perceived by the appraiser and the capital structure of the business is established in order to determine the present value of future cash-flow. These cash-flows are then summed. Since the business is expected to exist beyond 10 years, the value of this residual is developed, discounted to the present, and added to the

---

[6]Both expert witnesses were subjected to lengthy and searching cross-examination by the other petitioner or petitioners. On brief each side attacks the "credibility" of the other petitioner[s]'s expert. While one may disagree with an expert's methodology, underlying factual assumptions, or analysis of the same, such matters are seldom issues of "credibility" and are not in this case. As the Court stated in *Estate of Fittl v. Commissioner*, T.C. Memo. 1986-452, 52 T.C.M. 567, 571, 55 P-H Memo. T.C. par. 86,452 at 2097-2098:

In the present case, as in the ordinary case, any doubts about the reliability of an expert's testimony are based on the failure of the facts to support his assumptions and his ultimate opinion rather than any doubt as to whether the expert is expressing a truthful opinion.

Here, however, on being subjected to perhaps more thorough cross-examination than these well-qualified experts may be accustomed, they seemed, when challenged, to react more like "hired guns" than the disinterested professionals the Court recognizes them to be. The expert witnesses here served as whetstones on which the fine litigators trying this lawsuit honed their already formidable skills. The Court disregards the attacks on the experts' "credibility." In view of the Court's disposition of this case, it is unnecessary for the Court to analyze the experts' reports and testimony in detail. A brief summary will suffice.

value previously developed. This total is the value ascribed to the business entity. For closely held corporations two additional factors, one for lack of marketability and one for minority interest, are applied to this value in order to determine the fair market value of a minority share of the stock. Following this, price-to-earnings ratios of comparable companies are compared to the value of the minority interest previously developed and any discrepancies are investigated and reviewed.

It was Spiro's opinion that the appraiser of a closely held entity comparable to Fisk Telephone would be pleased if he or she knew for sure that the value was within plus or minus 30 percent of what he called the "true fair market value" of the stock valued. Spiro's report, dated April 10, 1987, also stated that due to the additional judgment required in valuing an option or warrant, an additional 5-percent range of error would be reasonable. Based on these ranges of value, Spiro found that the warrant of a stock which is closely held and has not been traded implies a range of values plus or minus 35 percent of the true fair market value. Equating the term "readily ascertainable" with the term "reasonable accuracy," Spiro found that a range of plus or minus 35 percent precludes the Telephone stock warrants from having a value which may be determined with "reasonable accuracy." Hence, Spiro concluded that the Telephone stock warrants did not have a readily ascertainable fair market value when they were issued in 1978.

The expert for petitioners Davis, Grey, and Electric was William H. Frazier, vice president of corporate finance for the investment banking firm of Lovett Mitchell Webb & Garrison, Inc. of Houston, Texas. In his attempt to determine whether the Telephone stock warrants had a readily ascertainable fair market value when they were issued, Frazier used another acceptable method, the comparable companies method. The method compares a closely held company with a comparable public company. In utilizing this approach, one must first gain a thorough understanding of the closely held company. This includes analyzing such factors as the nature of the company's business, industry conditions, the company's financial condi-

tion, pertinent national and regional economic conditions, and, based on the above, the expected future performance of the company. This same information is also available for publicly traded companies. In order to validate the claim of comparability between the company being valued and the public company being used as a benchmark, many of the foregoing factors must be similar.

In his detailed report dated April 13, 1987, Frazier determined that two publicly traded companies in the telephone interconnect industry, Norstan and Teltronics, were comparable to Fisk Telephone. Frazier's report explains that by examining the manner in which the public marketplace prices the stocks of these particular public companies, and by knowing the financial characteristics of these companies and Telephone, one can gain a meaningful insight as to how the stock of Telephone would be priced if it were publicly held. Using the mean of the price-to-earnings ratios of these two public companies, Frazier determined an appropriate price-to-earnings ratio for Telephone. Applying this multiple to Telephone's earnings per share at April 30, 1978, Frazier determined the fair market value of Telephone stock at May 1, 1978. This value was then discounted for the factors of lack of marketability and minority interest. In valuing the warrants themselves, Frazier used two well-known algebraic formulas, the Kassouf Formula and the Shelton Formula. Using each formula, Frazier determined a value for the Telephone warrants. These two values were within 2-percent of each other. Thus, it was Frazier's opinion that the Telephone warrants had a readily ascertainable fair market value of $0.79 per warrant when they were issued in 1978.

### ULTIMATE FINDINGS OF FACT

1. The stock warrants in this case were not compensatory in nature.

2. The stock warrants were not transferred in connection with, or in recognition of, the performance of services.

OPINION

The principal issue we must decide is whether section 83 applies to the Telephone stock warrants issued to petitioners Davis, Grey, and Electric. If we conclude that section 83 applies to the warrants, then we must further decide whether the warrants had a readily ascertainable fair market value at the time they were issued in 1978. If so, income from the warrants would be reportable by Davis, Grey, and Electric in 1978 and a deduction in a like amount would be available to Telephone that year; if not, income from the warrants would be reportable by them in 1980 when the warrants were exercised and the deduction in a like amount would be available that year to Centel as Telephone's successor in interest. This being a "whipsaw" situation, respondent has taken inconsistent positions, but is basically in the position of a stakeholder, seeking to collect additional tax either from Centel (successor in interest to Telephone), on the one hand, or from Davis, Grey, and Electric, on the other hand.[7]

Section 83(a), in pertinent part, provides:

SEC. 83(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property * * * , over
(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services * * * .

In addition, section 83(h), entitled "Deduction by Employer," allows a deduction under section 162 to the person for whom such services were performed in an amount equal to the amount included under section 83(a) in the gross income of the person who performed such services.

Petitioner Centel argues that section 83(a) applies to the warrants transferred to Davis, Grey, and Electric, that the warrants had no readily ascertainable fair market value in 1978, and hence must be reported in income when exercised in 1980, thus supporting Centel's claimed deduction in 1980

---

[7]Respondent has made such alternative deficiency determinations in other whipsaw situations. See, e.g., *Gerardo v. Commissioner,* 552 F.2d 549, 555-556 (3d Cir. 1977), affg. on this point a Memorandum Opinion of this Court; *Estate of Goodall v. Commissioner,* 391 F.2d 775, 782-783 (8th Cir. 1968), affg. on this point a Memorandum Opinion of this Court.

under section 83(h). Petitioners Davis, Grey, and Electric argue that section 83(a) does not apply to the warrants they received, and therefore they did not have the additional income under section 83(a) as determined by respondent.

In order for section 83 to apply to the transfer of the warrants in this case, it must be shown that the warrants were transferred "in connection with the performance of services" by Davis, Grey, and Electric. Sec. 83(a). Whether property is transferred in connection with the performance of services is essentially a question of fact. *Bagley v. Commissioner*, 85 T.C. 663, 669 (1985), affd. 806 F.2d 169 (8th Cir. 1986). Petitioners Davis, Grey, and Electric contend that the warrants were not transferred to them in connection with the performance of services. Petitioner Centel contends that the warrants were transferred in connection with the performance of services. For the reasons stated below, we conclude that the warrants were not transferred to Davis, Grey, and Electric in connection with the performance of services and that section 83 does not apply in this case.

As detailed in our findings of fact, the warrants were granted to Davis, Grey, and Electric in recognition of the increased risks they had assumed under the various personal guarantees, performance guarantees, and subordinations. Based on this finding, we think that the warrants were transferred "in connection with" the personal guarantees, performance guarantees, and subordinations given by Davis, Grey, and Electric. However, we further think the crux of this issue is whether assumption of the increased financial risks by Davis, Grey, and Electric under the guarantees and subordinations constituted "the performance of services" under section 83.

Unfortunately, the term "the performance of services," and specifically "services," is not defined in section 83. Moreover, the regulations under section 83 provide little assistance.[8] Our function in the interpretation of statutes is

---

[8]Sec. 1.83-3(f), Income Tax Regs., defining "property transferred in connection with the performance of services," provides as follows:

(f) *Property transferred in connection with the performance of services.* Property transferred to an employee or an independent contractor (or beneficiary thereof) in recognition of the performance of, or the refraining from performance of, services is considered transferred in connection with the performance of services within the meaning of section 83. The existence of

to construe the language so as to give effect to the intent of Congress. *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989); *J.C. Penney Co. v. Commissioner,* 37 T.C. 1013, 1019 (1962), affd. 312 F.2d 65 (2d Cir. 1962). It is well established that we may look to the legislative history of a statute where the statute is ambiguous. In addition, we may seek out any reliable evidence as to the legislative purpose even where the statute is clear. *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543-544 (1940); *U.S. Padding Corp. v. Commissioner, supra; Estate of Baumgardner v. Commissioner,* 85 T.C. 445, 451 (1985); *Huntsberry v. Commissioner,* 83 T.C. 742, 747-748 (1984); *J.C. Penney Co. v. Commissioner, supra.* Thus, we look to the legislative history of section 83 for any guidance it may provide.

Section 321(a) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, added section 83 to the Internal Revenue Code of 1954. The primary impetus behind the enactment of section 83 was to equate the tax treatment of restricted stock plans involving employers and employees to the tax treatment accorded other types of deferred compensation arrangements. H. Rept. 91-413 (Part 1)(1969), 1969-3 C.B. 200, 254; S. Rept. 91-552 (1969), 1969-3 C.B. 423, 500. Both the House Report, 1969-3 C.B. at 254, and the Senate Report, 1969-3 C.B. at 500, describe restricted stock plans as follows:

A restricted stock plan, generally, is an arrangement under which an employer transfers stock to one or more of his employees (often without the payment of any consideration), where the stock is subject to certain restrictions which affect its value. A restricted stock plan may cover only one employee or it may cover a number of employees. The stock transferred under a plan may be stock in the employer corporation, stock of another company—often an unrelated growth company—or even shares of a mutual fund.

The restrictions which are imposed on the stock are of various types. One type of restriction often imposed requires the employee to return the

---

other persons entitled to buy stock on the same terms and conditions as an employee, whether pursuant to a public or private offering may, however, indicate that in such circumstances a transfer to the employee is not in recognition of the performance of, or the refraining from performance of, services. The transfer of property is subject to section 83 whether such transfer is in respect of past, present, or future services.

This definition, equating "in connection with" to "in recognition of" the performance of services, furnishes no assistance as to what constitutes performance of services.

stock to the employer if he does not complete a specified additional period of employment and prohibits the employee from selling the stock in the interim. Another common type of restriction provides that the employee may not sell the stock for a specified period of time, such as a 5-year period, or until he retires.

Reading the clear statutory language, section 83 was intended by Congress to apply to property transferred by an employer to an employee in connection with the performance of services by the employee. It is also clear that section 83 applies in the case of services performed by independent contractors as well as employees. *Cohn v. Commissioner*, 73 T.C. 443, 446 (1979); Secs. 1.83-1(a)(1), 1.83-3(f), and 1.83-7(a), Income Tax Regs. Petitioners Davis, Grey, and Electric argue that since they were neither employees nor independent contractors of Telephone, section 83 does not apply to the warrants they received. This argument rather assumes the answer. We think that if the warrants were transferred in connection with, or in recognition of, the performance of services, Davis, Grey, and Electric, not being employees, would be independent contractors of Telephone. Sec. 83(a); sec. 1.83-3(f), Income Tax Regs. Thus, we direct our inquiry to whether or not the warrants were issued in connection with, or in recognition of, the performance of services. However, what constitutes the performance of services under section 83 is not addressed by Congress in the legislative history or in the language of the statute itself. It is also not addressed by the pertinent regulations. Thus, we turn to relevant case law.

As previously stated, whether property is transferred in connection with, or in recognition of, the performance of services is essentially a question of fact. In *Alves v. Commissioner*, 734 F.2d 478 (9th Cir. 1984), affg. 79 T.C. 864 (1982), the taxpayer (Alves) joined General Digital Corp. (the company) in 1970 as vice president for finance and administration. As part of an employment and stock purchase agreement entered into between Alves and the company, the company agreed to sell Alves 40,000 shares of the company's common stock at ten cents per share "in order to raise capital for the Company's initial operations while at the same time providing the Employee with an

additional interest in the Company * * * ." *Alves v. Commissioner, supra,* 734 F.2d at 480. That price represented the fair market value of the stock and did not contain any bargain sale element. One-third of the shares were subject to repurchase by the company if Alves left the company within 4 years and one-third were subject to repurchase if Alves left within 5 years. The Commissioner determined that the difference between the fair market value of the shares when the restrictions ended and the purchase price paid for the shares constituted ordinary income to Alves under section 83(a). The issue in the case was whether Alves obtained the stock "in connection with the performance of services." Alves argued that since he paid the fair market value for the shares, he did not obtain the stock "in connection with the performance of services." This Court and the Ninth Circuit rejected his argument, concluding that the plain language of the statute did not require that the property be transferred as "compensation" for the performance of services but only "in connection with" the performance of services. In affirming this Court's holding that the stock was obtained in connection with performance of services, the Ninth Circuit looked to the facts that Alves purchased the stock when he signed his employment agreement and that the stock restrictions were linked explicitly to his tenure with the company. *Alves v. Commissioner, supra,* 734 F.2d at 481. In addition, the Ninth Circuit noted that the parties had stipulated that the restricted stock's purpose was to ensure that key personnel would remain with the company. 734 F.2d at 481.

In *Bagley v. Commissioner,* 806 F.2d 169 (8th Cir. 1986), affg. 85 T.C. 663 (1985), the taxpayer (Bagley) entered into an employment contract with Spencer Foods, Inc. (Spencer) in which Bagley agreed to work for Spencer for 5 years as vice president of its fabricating division. The employment agreement provided that Bagley would receive an annual salary, a discretionary bonus, and a qualified stock option to purchase 10,000 shares of Spencer common stock. A separate stock option agreement was executed which granted Bagley the option to purchase 10,000 shares of Spencer common stock at $5 dollars per share. Three years later, Bagley and Spencer terminated their employment

relationship when all of Spencer's outstanding common stock was acquired by another corporation. As part of the termination, Spencer received $70,000 for the 10,000 shares subject to the option. This amount represented the difference between the $5-per-share option exercise price and the $12-per-share tender offer. Bagley reported the $70,000 received as long-term capital gain. The Commissioner determined the $70,000 was ordinary income to Bagley under section 83.

In determining whether the $70,000 received by Bagley was transferred to him in connection with the performance of services within the meaning of section 83, the Tax Court looked to several factors. Those factors included: the fact that the grant of the option was provided for in the employment agreement, pursuant to which Bagley agreed to render services as an employee of Spencer; that the option was granted under the option agreement, which referred to Bagley as a "key employee;" that the sole consideration furnished by Bagley in exchange for the option was his promise to render services as an employee; and that Spencer's intent in granting the option was to compensate and better secure Bagley's services as its employee while simultaneously providing Bagley additional incentive to put forth maximum effort for the success of the business. All of those facts supported our conclusion that for purposes of section 83, the option was transferred to Bagley in connection with, or in recognition of, the performance of services. *Bagley v. Commissioner, supra,* 85 T.C. at 669-670. The Eighth Circuit thoroughly reviewed the record in the case and affirmed our "well-reasoned opinion." *Bagley v. Commissioner, supra,* 806 F.2d at 171.

The facts in the present case, however, are wholly distinguishable from those in *Alves* and *Bagley.* In both *Alves* and *Bagley,* the taxpayers were employees and received their restricted stock options[9] in connection with executed employment agreements wherein they agreed to perform services as employees for their respective employers. In the present case, there were no employment agree-

---

[9]We consider the "warrants" involved in this case as the equivalent of "options" and none of the parties in the case has ever suggested otherwise. See *Shamburger v. Commissioner,* 61 T.C. 85, 90 (1973), affd. per curiam 508 F.2d 883 (8th Cir. 1975).

ments executed between Telephone and either Davis, Grey, or Electric. It is undisputed that Davis, Grey, and Electric were *not* employees of Telephone. In both *Alves* and *Bagley,* the employers' intent in granting the stock options was to ensure that the employers retained the employment services of their key employees. In the present case, Telephone granted the stock warrants to Davis, Grey, and Electric in their capacity as shareholders and in recognition of the increased financial risks these shareholders had assumed under the personal guarantees, performance guarantees, and subordinations.

In *Bagley,* the sole consideration furnished by Bagley in exchange for the option was his promise to render services as an employee of Spencer. In *Alves,* while the taxpayer paid the fair market value for the options and did not receive them as part of his compensation package, he nonetheless received the options in connection with, or in recognition of, his performance of services as an employee. In the present case, the "consideration" given by Davis, Grey, and Electric were the personal guarantees, performance guarantees, and subordinations to enable the corporation to obtain financing for its operating capital. Moreover, while petitioner Centel argues that Davis, Grey, and Electric were independent contractors, there is no suggestion, and the record would not support a finding, that any one of them was engaged in a trade or business (or activity engaged in for profit) of guaranteeing loans, guaranteeing performance, or subordinating indebtedness for a fee. On the contrary, these continuing guarantees and subordinations were given by Davis, Grey, and Electric voluntarily and without any expectation of consideration or payment from Telephone. They were given almost 2-years prior to any formal discussion of the warrants by the Telephone board of directors and almost 5-years prior to the time the warrants were actually granted.

The personal guarantees, performance guarantees, and subordinations were essentially an assumption of additional financial risk on the part of Davis, Grey, and Electric in their role as shareholders or investors. We think these are shareholder/investor actions to protect their investment in Telephone and as such do not constitute the performance of

services and do not arise "in connection with the performance of services" within the meaning of section 83. The parties have not cited, and we have not found, any case exactly on point under section 83 or under other Code sections. The parties rely on various cases by analogy.

Petitioners Davis, Grey, and Electric argue that, by giving the guarantees and agreeing to the subordinations, they were in effect substituting their own credit for that of Telephone. Cf. *Bank of America v. United States,* 230 Ct. Cl. 679, 680 F.2d 142, 149 (1982). While *Bank of America* did not involve section 83, we think the case has some relevance to our issue of whether the guarantees and subordinations constituted the performance of services.

The issue in *Bank of America* was whether, for purposes of computing the section 901 foreign tax credit, certain commissions received by the taxpayer-bank were United States source income or foreign source income. A portion of the commissions received by the bank was related to transactions in which the bank "confirmed" letters of credit issued by foreign banks. The essence of these confirmation transactions was the substitution of the taxpayer-bank's credit for that of the foreign banks. *Bank of America v. United States, supra,* 680 F.2d at 150. In order to determine whether these "confirmation commissions" were United States or foreign source income, it was necessary for the court to analogize the commissions to one of the classes of income listed in sections 861 and 862, specifically whether it was income from interest or income from personal services.[10] The Government in *Bank of America, supra,* argued that the bank received the commissions for services, which would have made the commissions United States source income (which would have reduced the bank's foreign tax credit). The bank, on the other hand, argued that it was not being paid for personal services but instead for the use of its credit. Analogizing the transaction to a loan, the bank claimed the commissions it received were similar to interest received on a loan. If the commissions were considered interest, they would have been foreign source income (which

[10]The classes of income specified in secs. 861 and 862 include the following: interest, dividends, personal services, rentals and royalties, income derived from the disposition of real property, income from the sale or exchange of personal property, and underwriting income.

would have increased the bank's foreign tax credit). In holding that the confirmation transactions resembled loans, and that therefore the commissions should be considered received as interest and not in return for services, the Court stated:

Thus, from the moment of confirmation the plaintiff has made an enforceable promise to pay regardless of any change in the foreign bank's financial condition. As in acceptance and loan transactions, the plaintiff here has acted as an intermediate, has assumed the risk of default of the foreign bank, and has assured the draft's holder of payment.

* * * Thus, it is apparent what plaintiff was really charging for was not the services performed but the substitution of its own credit for that of the foreign bank. The predominant feature of the confirmation transactions was the substitution of plaintiff's credit for that of the foreign banks. The services performed were subsidiary to this. Therefore due to the similarities between a confirmation and a loan transaction, we hold that the confirmation commissions should be sourced by analogy to interest. * * * [Bank of America v. United States, 680 F.2d at 149-150.]

Davis, Grey, and Electric simply signed guarantees and subordinations; they performed no services "subsidiary" to them. We think Bank of America v. United States, supra, lends some support to the view that the guarantees and subordinations given by Davis, Grey, and Electric did not constitute the performance of services under section 83.

In arguing that the guarantees and subordinations do constitute the performance of services under section 83, petitioner Centel cites several reasonable compensation cases. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315 (5th Cir. 1987), affg. T.C. Memo. 1985-267; B.B. Rider Corp. v. Commissioner, 725 F.2d 945 (3d Cir. 1984), affg. in part, vacating and remanding in part T.C. Memo. 1982-98; R. J. Nicoll Co. v. Commissioner, 59 T.C. 37 (1972); Shotmeyer v. Commissioner, T.C. Memo. 1980-238; Ledford Construction Co. v. Commissioner, T.C. Memo. 1977-204; and Allison Corp. v. Commissioner, T.C. Memo. 1977-166. In all of these reasonable compensation cases, there was no dispute that services had been rendered by an employee, usually a shareholder-employee. The issue involved was the reasonableness of the amount of compensation paid by the employer to its employee for purposes of the employer's deduction under section 162(a)(1). Generally, section 162(a)(1) allows a business deduction for reasonable compensation

paid "for personal services actually rendered." Whether the amount of compensation is reasonable is a question of fact, and in making this determination courts consider and weigh a myriad of factors.[11]

In deciding the issue of whether reasonable compensation was paid, the court in each of these cases made a passing reference to the fact that the employee had guaranteed corporate obligations. See, e.g., *Owensby & Kritikos, Inc. v. Commissioner, supra,* 819 F.2d at 1325, n. 33, "That Mr. Owensby and Mr. Kritikos personally guaranteed certain loans to the corporation also weighs in favor of munificent compensation."; and *B.B. Rider Corp. v. Commissioner, supra,* 725 F.2d at 952, "There is no doubt that the services that Benjamin performed for Rider/General were extensive and valuable. Benjamin's ability to obtain financing, including his willingness to continue to guarantee corporate obligations, was vital to the survival of Rider/General."

We do not find the reasonable compensation cases cited by Centel particularly helpful in deciding the issue in the present case. In those cases, there was no dispute that services had been rendered by an employee. While the regulations under section 162 provide that to be deductible as compensation for personal services, the payment must be both reasonable in amount and a payment "purely for services" (sec. 1.162-7(a), Income Tax Regs.), once it is determined that services have been rendered by an employee, the courts then appropriately focus on whether the amount paid was reasonable. *Owensby & Kritikos, Inc. v. Commissioner, supra,* 819 F.2d at 1323 n. 14. In other words, the so-called second prong as to "compensatory purpose" is seldom addressed and is normally subsumed into the broad inquiry as to reasonableness. See *Elliotts, Inc. v. Commissioner,* 716 F.2d 1241, 1243-1245 (9th Cir. 1983), revg. a Memorandum Opinion of this Court. In making the determinations of reasonable compensation for services rendered by an employee, these cases do not consider, except perhaps by silent implication, whether loan guarantees constitute performance of service. Indeed, none

---

[11]For listings of some of these factors, see *Kennedy v. Commissioner,* 671 F.2d 167, 173-174 (6th Cir. 1982), revg. 72 T.C. 793 (1979); and *Mayson Mfg. Co. v. Commissioner,* 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.

of these cases so holds. Certainly none of the cases considers loan guarantees by a shareholder who is not an employee. As previously stated, in the present case neither Davis, Grey, nor Electric was an employee of Telephone.[12] Thus, in making our factual determination of whether Davis, Grey, and Electric received the warrants in connection with the performance of services under section 83, we place little reliance on the reasonable compensation cases cited by petitioner Centel. We place some reliance on the holding and rationale of *Bank of America v. United States, supra,* cited by the other petitioners.

However, other cases involving a shareholder who has guaranteed a corporate loan, while not arising under section 83, may provide a closer analogy. We have in mind cases where the shareholder-guarantor has been compelled to pay under his guarantee. A shareholder-guarantor's payment of a corporate debt typically gives rise to a nonbusiness bad debt deduction. *Putnam v. Commissioner,* 352 U.S. 82 (1956). In the usual bad debt case, the issue is whether the bad debt is a business (ordinary) or a nonbusiness (capital) bad debt. The business of a corporation, however, is not also the trade or business of the shareholder. *Whipple v. Commissioner,* 373 U.S. 193, 202 (1963). Thus, to have a business deduction, a shareholder must show that his payment of corporate debt or expense was made to protect his own separate trade or business rather than to protect his investment in the stock of the corporation. *United States v. Generes,* 405 U.S. 93, 100-103 (1973). Neither Davis, Grey, or Electric was in the business of guaranteeing debts or guaranteeing performance. Davis and Grey were not in the business of being employees, i.e., they were not corporate executives with a salary to protect. See note 12, *supra.* Thus had Telephone not prospered as it did and had Davis and Grey been called upon to pay Telephone's debts or its other expenses, any deduction no doubt would have been limited to a nonbusiness (investment) bad debt or capital loss.

---

[12]While Grey rendered some consulting services as an independent contractor for which he was compensated, that compensation is not involved in this case. There is no contention that Grey guaranteed the corporate loans to protect that consulting income. *United States v. Generes,* 405 U.S. 93 (1973).

While that result may not be quite as clear as to Electric, we think the same result would follow. Some of Electric's customers may have been customers of Telephone, and Electric was perhaps lending its established business reputation to reassure customers of the interconnect business since both the telephone interconnect industry itself and Telephone were new and untried ventures at that time. Thus, had Electric been called upon to pay under the performance guarantees and subordination agreements, it might try to argue that such payments of Telephone's obligations were somehow proximately related to its own electrical contracting business and hence deductible by it as ordinary and necessary business expense. There are some extraordinary circumstances where a taxpayer has successfully argued that payment of another taxpayer's expenses is so closely related to his own trade or business as to be deductible by him.[13] Here, however, we think any such payments could only be viewed as relating to Electric's investment in the stock of Telephone and any deduction limited to a capital loss deduction.

As it turned out, the telephone interconnect venture was successful, Telephone prospered, and instead of being called upon to pay under their personal guarantees, performance guarantees, and subordinations, Davis, Grey, and Electric received stock warrants in recognition of their assumption of the additional financial risks in regard to their investments in Telephone. We think that in this case their personal guarantees, performance guarantees, and subordinations do not constitute the performance of services by an employee or independent contractor, but instead have more of a shareholder/investment aura. When the stock warrants were ultimately exercised, there was a realignment of the equity interest in the corporation, giving Davis, Grey, and Electric a greater equity interest and diluting the interest of the other shareholders. The transfer of stock warrants in this case is more akin to, or in recognition of, the shareholders' making additional contributions to capital. Cf. *Commissioner v. Fink,* 483 U.S. 89 (1987), involving a

---

[13]See *Gould v. Commissioner,* 64 T.C. 132 (1975); *Lohrke v. Commissioner,* 48 T.C. 679 (1967); *Pepper v. Commissioner,* 36 T.C. 886 (1961); *Dinardo v. Commissioner,* 22 T.C. 430 (1954). See also *Jenkins v. Commissioner,* T.C. Memo 1983-667.

non-pro-rata surrender of stock in a closely held corporation as a contribution to capital.

As the record and our findings of fact show, Telephone was not a profitable company in its early years. The bank loans Telephone secured supplied the capital it needed to turn profitable. Before they would grant the loans, the banks required personal guarantees, performance guarantees, and subordinations from Telephone's three largest shareholders, Davis, Grey, and Electric. The guarantees and subordinations were given by Davis, Grey, and Electric without any expectation of consideration or payment from Telephone. Instead, the record reflects that the guarantees and subordinations were given "to keep the company surviving, to keep it in operation," or, in other words, to protect and enhance Davis, Grey, and Electric's investments in Telephone. See sec. 1.61-15(b)(2), Income Tax Regs. We do not consider these shareholder actions "the performance of services" under section 83 merely because several years later these shareholders were granted stock warrants in recognition of the increased financial risks they had assumed under the guarantees and subordinations. We think these shareholder actions are more akin to capital transactions to protect their investment in the stock of Telephone than to the performance of services by an employee or independent contractor. Thus, we conclude that Telephone did not transfer, and Davis, Grey, and Electric did not receive, the warrants "in connection with the performance of services" within the meaning of section 83.

Centel argues on brief that even if the warrants were not transferred in connection with the performance of services, that the rules of section 1.83-7, Income Tax Regs., and thus section 83 itself, would still govern the warrants' tax treatment. Section 1.83-7, Income Tax Regs., sets forth rules for applying section 83 in the case of an employee or independent contractor who receives a nonqualified stock option in connection with the performance of services. The warrants in the present case are the equivalent of nonqualified stock options in section 1.83-7, Income Tax Regs. Centel argues that through the operation of section 1.61-15, Income Tax Regs., the rules of section 1.83-7, Income Tax Regs., are still applicable to the warrants in the

present case. Centel argues that section 1.61-15, Income Tax Regs., in effect serves as a "safety net" to assure that the rules of section 1.83-7, Income Tax Regs., and thus section 83 itself, apply to all compensatory stock options. However, we have concluded that the warrants in this case were not compensatory in nature and that the warrants were not transferred either as compensation for, or in connection with, the performance of services. While we think in a proper case Centel's argument has some merit (note 14, *infra*), we do not think it helps petitioner Centel in the present case.

Section 1.61-15, Income Tax Regs., in pertinent part, provides:

Sec. 1.61-15. Options received as payment of income.

(a) *In general.* Except as otherwise provided insec. 1.61-2(d)(6)(i) (relating to certain restricted property transferred after June 30, 1969), if any person receives an option in payment of an amount constituting compensation of such person (or any other person), such option is subject to the rules contained in sec. 1.421-6 for purposes of determining when income is realized in connection with such option and the amount of such income. * * *

In general, section 1.61-15, Income Tax Regs., promulgated in final form in 1963 by T.D. 6696, 1963-2 C.B. 61, extends the rules of section 1.421-6, Income Tax Regs., which pertain to options granted by employers to employees in connection with their employment, to options received by any person in payment of an amount constituting compensation of such person. As the regulation states, section 1.61-15(a), Income Tax Regs., applies the rules of section 1.421-6, Income Tax Regs., "for purposes of determining when income is realized in connection with such option and the amount of such income." We think implicit in section 1.61-15(a), Income Tax Regs., is that the options or warrants be transferred (or received) in connection with the performance of services. This is borne out by section 1.61-2(d)(6)(i), which restricts the application of section 1.61-15, Income Tax Regs., for transfers of property occurring after June 30, 1969. Section 1.61-2(d)(6)(i) provides:

(6) *Certain property transferred, premiums paid, and contributions made in connection with the performance of services* after June 30, 1969. (i) *Exception.* Paragraph (d)(1), (2), (4), and (5) of this section and sec. 1.61-15

do not apply to the transfer of property (as defined in sec. 1.83-3(e)) after June 30, 1969, unless sec. 1.83-8 (relating to applicability of section 83 and transitional rules) applies. If section 83 applies to a transfer of property, and the property is not subject to a restriction that has a significant effect on the fair market value of such property, then the rules contained in paragraph (d)(1), and (2), and (4) of this section and sec. 1.61-15 shall also apply to such transfer to the extent such rules are not inconsistent with section 83. [Added emphasis indicated by underscoring.]

Since the warrants in the present case were not transferred either as compensation for, or in connection with, the performance of services, we reject petitioner Centel's argument that the rules of section 83 apply to the warrants in this case through the operations of section 1.61-15, Income Tax Regs.[14]

In view of our disposition of the principal issue in this case, we do not reach the issue of whether the warrants had a readily ascertainable fair market value when they were issued.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[14]As previously stated, however, we think Centel's "safety net" argument has some merit in the right circumstance. Such a circumstance is our recent opinion in *Pagel, Inc. v. Commissioner,* 91 T.C. 200, (1988), on appeal (8th Cir. 12/12/88). In *Pagel,* we had to decide whether a warrant received *in connection with the performance of services* had a readily ascertainable fair market value for purposes of section 83. In fn. 15, we recognized that a technical reading of the statute and regulations would have resulted in the warrant in issue in that case not being subject to any regulation provision. *Pagel, Inc. v. Commissioner,* 91 T.C. at 217 n. 15. This was so because sec. 83(e)(3) states that sec. 83 does not apply to the transfer of an option (warrant) without a readily ascertainable fair market value, and sec. 83(a), by its terms, applies only to a transfer of property in connection with the performance of services. Thus, we recognized that a warrant without a readily ascertainable value at the time it was transferred by the recipient of services was not subject to taxation under sec. 83 and that the sec. 83 regulations did not appear to provide the authority to tax the performer of the services. Realizing that in this instance sec. 61, by default, should control taxation of the property, but also noting that under the transition rules of sec. 1.61-15(a) and 1.61-2(d)(6)(i), Income Tax Regs., these sec. 61 regulations did not technically apply either, we went on to state:

We nevertheless believe that the regulatory scheme is intended to apply to options taxable under both section 83 and section 61. We thus shall apply the scheme of the section 83 regulations as if it technically applied to options which fell out of the provisions of section 83 into those of section 61. * * * [*Pagel, Inc. v. Commissioner, supra,* 91 T.C. 200, 217 n. 15.]

However, the present case is distinguishable from the situation in *Pagel.* Sec. 83 does not apply to the warrants in the present case because they were not transferred in connection with the performance of services. Here the warrants were not compensatory, but were issued in recognition of something akin to contributions to capital. Thus, neither sec. 83 nor sec. 61 applies.