DENNIS R. HAYDON AND KRISTINE S. HAYDON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Haydon v. Commissioner
Docket No. 22828-87
United States Tax Court
T.C. Memo 1990-551; 1990 Tax Ct. Memo LEXIS 623; 60 T.C.M. (CCH) 1066; T.C.M. (RIA) 90551; 13 Employee Benefits Cas. (BNA) 1255; October 23, 1990, Filed *623 Decision will be entered under Rule 155. Robert M. Moise and B. W. Enlow, for the petitioners. Willard N. Timm, Jr., for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 89,289.14 in petitioners' 1982 Federal income tax. After concessions, the issue remaining for decision is whether petitioner Dennis R. Haydon was granted an incentive stock option, taxation of which is governed by sections 421 and 422A, or a nonqualified stock option, taxation of which is governed by section 83. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the taxable year 1982, and all rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioners, Dennis R. and Kristine S. Haydon, lived in Charleston, South Carolina, at the time they filed their petition in this case. Petitioners were cash method, calendar *627 year taxpayers filing a joint Federal income tax return for 1982. All references to petitioner in the singular will be to Dennis R. Haydon. Sam Solomon Company, Inc. (hereinafter Solomon Co.) was a publicly owned corporation. Until the merger of Solomon Co. into Service Merchandise Company, Inc. of Nashville, Tennessee (hereinafter Service Merchandise) on August 10, 1982, the stock of Solomon Co. was traded over the counter. Solomon Co. was a general merchandise business which sold its goods through catalog showrooms located in North Carolina, South Carolina, Georgia and Florida. Solomon Co. primarily sold items such as jewelry, home electronic equipment, toys, sporting goods, small appliances, housewares, and luggage. Its retail policy was based on high volume, low-profit-margin sales. The ultimate profit of the corporation depended on a high turnover of goods. Solomon Co.'s fiscal year ended on January 30 or January 31. The corporation's profitability depended on its operating results for the final quarter of each fiscal year. Generally, over 45 percent of its sales and substantially all of its profits were generated in the fourth quarter of its fiscal year. In 1980 *628 Solomon Co. began to experience financial troubles. On August 21, 1980, Solomon Co. filed a petition for relief under Chapter 11 of the Federal Bankruptcy Code. The corporation reported a net loss of $ 2,286,300 for its fiscal year ending January 31, 1981, which translated into a loss per share of $ 1.32. On May 27, 1981, the United States Bankruptcy Court for the District of South Carolina confirmed Solomon Co.'s Modified Plan of Reorganization. Petitioner had two periods of employment with Solomon Co. In August 1980, shortly after Solomon Co. filed for bankruptcy, petitioner was hired as chief financial officer. Petitioner was known for his ability to "turn around" sick companies. During this first period of employment, Solomon Co. granted petitioner an option under its 1980 Stock Option Plan (hereinafter 1980 Plan) to purchase 35,000 shares of its $ .10 par value common stock at $ 2 per share. The 1980 Plan was a nonstatutory (i.e., nonqualified) stock option plan. It originally authorized the grant of options to purchase up to 50,000 shares, in the aggregate, of Solomon Co.'s $ .10 par value common stock. The board of directors amended this plan on February 11, 1981, to *629 authorize options to purchase up to 100,000 shares. The purchase price of the common stock under each option was to be determined by the board of directors, but it was "in no event [to be] less than the par value of the Common Stock." On October 6, 1981, petitioner terminated his employment with Solomon Co. because a more lucrative position arose in New York City. Petitioner resigned from Solomon Co. and forfeited the stock option granted to him under the 1980 Plan. Solomon Co. continued to experience financial difficulties after petitioner resigned. The Creditors' Committee supervising the reorganization became concerned. In the fall of 1981, poor retail sales and limited cash resources forced the company to close its four Florida stores, leaving it with only seven stores in the southeast. It attempted to generate cash through going-out-of-business sales. For its fiscal year ending January 30, 1982, Solomon Co. posted losses of $ 5,529,100, or losses of $ 3.18 per share. Because of petitioner's financial expertise and his presumed ability to get the company back on its feet, several members of the board and the Creditors' Committee wanted him to return to Solomon Co. *630 After several conversations between board member Steven Grossman and petitioner, and a meeting between petitioner and the president of Solomon Co., Melvin Solomon, petitioner was rehired as executive vice president and chief executive officer. The meeting between petitioner and Mr. Solomon took place in mid-December. A letter to petitioner from Mr. Solomon, dated December 21, 1981, stated: Dear Dennis: This will confirm our understanding that we will issue you stock options to purchase 50,000 shares of Sam Solomon Common Stock at today's market value of $ 1.00 per share. The option agreement and employment contract will be approved by the Board of Directors at its next meeting. These options will be exercisable under the terms of the employment contract. A handwritten notation dated December 22, 1981, and initialled by petitioner appeared in the bottom corner of this letter. [1] This notation reads, "Agreed & exercized [sic] 50,000 shares." Mr. Solomon owned less than 50 percent of the stock of Solomon Co. and could not hire petitioner or grant stock options without board approval. *631 By the end of 1981, Solomon Co. had two principal stock option plans in effect. [2] One was the 1980 Stock Option Plan; the other was the 1981 Incentive Stock Option Plan (hereinafter ISO Plan). The ISO Plan authorized certain employees to purchase up to 175,000 shares, in the aggregate, of $ .10 par value Solomon Co. common stock at a price "not less than 100 percent of the fair market value of the Stock at the time the option is granted * * *." The individuals eligible to receive incentive stock options were key employees who were "eligible to receive such options under Section 422A of the Code and who, in the opinion of the Board are from time to time primarily responsible for the management, growth, development and expansion of some part or all of the business of the Company * * *." The ISO Plan provided that the purchase price was to be paid in full on the date of purchase. The ISO Plan also provided that "Options shall be exercised by written notice to the Corporation in the manner set forth in the option agreement." The ISO Plan was adopted (subject to shareholder approval) in October 1981 and amended on February 2, 1982. *632 On February 1, 1982, petitioner and Solomon Co. executed an employment agreement. That agreement provided that February 1, 1982, was the "Commencement Date" of petitioner's employment with Solomon Co. [3] Petitioner's employment was to continue through December 31, 1983 (the "Termination Date"). The employment agreement in part provided petitioner with base compensation of $ 100,000 per year and granted him an option to purchase 50,000 shares of Solomon Co. stock: Employer hereby grants to Employee an option to acquire *633 up to 50,000 shares of the $ .10 par value common stock of Employer, at a price of $ 1.00 per share, exercisable at any time prior to the expiration of six months after the Termination Date (such date, six months after the Termination Date, is referred to herein as the "Option Expiration Date"), in accordance with the provisions of the Stock Option Agreement in the form annexed as Exhibit 1 hereto. [4]
In February 1982, petitioner, in a separate and unrelated transaction, purchased 3,000 shares of Solomon Co. common stock at $ 4.654 per share, for a total cost of $ 13,962. Three other employment agreements were executed at approximately the same time as petitioner's -- those *634 for Stanley Weiner, James F. Etter, and Richard J. Whalen. See n.4, supra. The four employment agreements were negotiated at approximately the same time. Petitioner was involved extensively in the negotiations. Many of the terms in the contracts were the same. However there were individually crafted provisions on items such as moving expenses and sales of a residence. There were also some important differences in regard to stock options. Of these four employment agreements, the stock option paragraph of Mr. Whalen's agreement was the only one specifying that the option was granted under the 1981 Incentive Stock Option Plan. The minutes of the February 2, 1982, board meeting stated, in part, that "The four employment contracts grant stock options in varying amounts. All options are for a purchase price of $ 1.00 for non-qualified options, or $ 1.25 for incentive stock options." However, the stated purchase price in all four employment agreements was $ 1 per share. Stanley Weiner was hired as senior vice president and chief operating officer. The stock option paragraph of his February 12, 1982, employment agreement was identical to that in petitioner's agreement, with *635 two exceptions. First, Mr. Weiner's option extended to only 25,000 shares. Second, the paragraph concluded: "In addition, Employer shall deliver to Employee 15,000 shares of the $ .10 par value common stock of Employer as soon as practicable after the commencement date." James F. Etter had been hired back in September 1981 and sometime in 1981 had already assumed the duties of chief financial officer. The stock option paragraph in his February 1, 1982, employment agreement granted him an option to purchase 15,000 shares. All other language in the stock option paragraph was identical to that in the stock option paragraph of petitioner's employment agreement. However, his rate of compensation was made retroactive to December 15, 1981, suggesting that that is when he assumed the duties of chief financial officer. Richard J. Whalen was hired as vice president-director of operations. The record does not indicate when he first assumed those duties. His employment agreement was dated February 11, 1982, and his rate of compensation was made retroactive to December 15, 1981. The stock option paragraph in Mr. Whalen's agreement provided: Employer hereby grants to Employee under *636 the Employer's 1981 Incentive Stock Option Plan, an option to acquire up to 15,000 shares of the $ .10 par value common stock of Employer, at a price of $ 1.00 per share, exercisable at any time prior to the expiration of six months after the Termination Date (such date, six months after the Termination Date, is referred to herein as the "Option Expiration Date"), in accordance with the provisions of the Stock Option Agreement in the form annexed as Exhibit 1 hereto. Each of the four employment agreements provided as follows: 9. Entire Agreement
This Agreement contains the entire agreement of the parties with respect to its subject matter, supercedes all prior oral and written discussions and understandings, and no waiver, modification or change of any of its provisions shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced. The parties agree that the stock options did not have a readily ascertainable fair market value on the date granted. Solomon Co. stock, however, was traded over the counter. On December 21, 1981, the fair market value of a share of common stock was $ 1 per *637 share. On February 1, 1982, that stock had a fair market value of $ 1.25 per share. On June 4, 1982, pursuant to his option, petitioner purchased 50,000 shares of Solomon Co. stock at $ 1 per share. At that time, the fair market value of the common stock was $ 5.625 per share. Petitioner terminated his employment on the same day. Thus, when he left the company, his total stock holdings in Solomon Co. consisted of the 50,000 shares received pursuant to the exercise of the option (hereinafter option shares) and the 3,000 shares purchased in February (hereinafter purchased share). Two months later, on August 10, 1982, Solomon Co. was acquired by and merged into Service Merchandise. [5] Petitioner's shares of Solomon Co., along with Mr. Solomon's stockholdings, were necessary to effect that merger. On the same day, Service Merchandise exchanged its stock for petitioner's Solomon Co. stock at the rate of 0.4 of a share of Service Merchandise for each share of Solomon Co. Petitioner received 20,000 Service Merchandise shares for his 50,000 Solomon Co. option shares and 1,200 Service Merchandise shares for the 3,000 purchased shares. *638 On September 10, 1982, petitioner sold 10,000 shares of the Service Merchandise stock (8,800 attributable to the option shares and 1,200 attributable to the purchased shares) in an installment sale for $ 173,750. Petitioner reported the gain on his 1982 tax return as short-term capital gain. Respondent issued a notice of deficiency on April 9, 1987, determining that petitioner had compensation income in the amount of $ 231,250 upon the exercise of a nonqualified stock option. Respondent also recomputed the short-term capital gain on the sale of the 8,800 shares received pursuant to that option to take into account the stepped-up basis of those shares resulting from that income inclusion. OPINION The sole issue issue remaining for decision is whether petitioner's stock option was granted pursuant to a nonqualified stock option plan, or whether it was granted pursuant to the 1981 Incentive Stock Option Plan (hereinafter ISO Plan). Respondent says the option was not granted under the ISO Plan and is governed by section 83. Petitioner says the option was granted under the ISO Plan and is governed by sections 421 and 422A. *639 Section 83 governs the timing and characterization of income when property is transferred in connection with the performance of services. The general rule of section 83(a) taxes the service provider on the difference between the fair market value of the property and the amount paid for that property in the first taxable year in which the rights in the property are transferable or are not subject to a substantial risk of forfeiture. [6] *640 This amount is treated as compensation to the service provider and the person for whom the services are performed is given a corresponding deduction. Section 83, however, does not apply to "the transfer of an option without a readily ascertainable fair market value." Section 83(e)(3). The application of section 83 is deferred until the time such an option is exercised or disposed of, rather than at the time it is granted. Sec. 1.83-7(a), Income Tax Regs.[7]
The parties have stipulated that the options to purchase Solomon Co. stock had no readily ascertainable fair market value at the time they were granted. Moreover, the options were nontransferable. Therefore, if section 83 applies, it would not require the recognition of income at the time the options were granted. It would, however, require income to be *641 recognized at the time the options were exercised. The amount included in gross income would be the excess of the fair market value of the property received in exchange (i.e., the value of the shares) over the amount paid for the option. The character of the income would be ordinary under section 83(a). See also section 1.83-1(a)(1), Income Tax Regs. The basis of the stock received upon exercise of the option would be increased by the amount of compensation included in gross income pursuant to section 83. And the employer would have a section 162 deduction (ordinary and necessary business expense) for the same amount, and in the same taxable year, as the income inclusion of the person who performed the services. Sec. 1.83-6(a), Income Tax Regs.
Section 83(e)(1) provides, however, that section 83 shall not apply to "a transaction to which section 421 applies." Thus, if stock is transferred pursuant to the exercise of an incentive stock option, section 421, and not section 83, will govern the timing and characterization of the income. *642 While section 83 treats the taxable amount as compensation and, hence, ordinary income, section 421 defers recognition of income and recharacterizes the gain as capital when certain types of stock options are involved. These are incentive stock options, also referred to as qualified stock options and statutory stock options, and are defined in section 422A(b), discussed below. Section 421 provides two primary tax benefits to the recipient of incentive stock options -- it defers recognition of income until the shares received pursuant to the exercise of the option are disposed of and it characterizes any gain from the disposition of those shares as capital. Under section 421(a), three consequences occur when stock is transferred to an individual in a section 422A(a) transaction. [8] First, no income is recognized to the employee when the option is exercised and the shares are transferred. Second, the employer corporation is not allowed a section 162 deduction with respect to the transferred shares. Third, the employer corporation is considered as receiving no amount other than the option *643 price. Section 422A(a) provides in part that section 421(a) applies to the transfer of stock pursuant to the exercise of an incentive stock option if three requirements are satisfied: (1) the employee does not dispose of the stock within two years of the date of grant; (2) the employee *644 does not dispose of the stock within one year after the date of transfer; and (3) the individual continues to be an employee of the corporation from the date of grant up to three months before the date of exercise. [9]
The "incentive stock option" is a statutory creation, the purpose of which is to "provide an important incentive device for corporations to attract *645 new management and retain the service of executives who might otherwise leave, by providing an opportunity to acquire an interest in the business." S. Rept. No. 97-144, (1981), 1981-2 C.B. 412, 449. "Incentive stock option" is defined in section 422A(b). [10] Among the several requirements, this section provides that the option price cannot be less than the fair market value of the stock at the time the incentive stock option is granted. Sec. 422A(b)(4). *646 There are two important distinctions between section 83 and section 421. The first is that section 83 applies to anyone who performs services, regardless of whether that person is an independent contractor or an employee. Centel Communications Co. v. Commissioner, 92 T.C. 612, 629 (1989), on appeal (7th Cir., Dec. 4, 1989); Pagel, Inc. v. Commissioner, 91 T.C. 200, 205 (1988), affd. 905 F.2d 1190 (8th Cir. 1990). On the other hand, an employment relationship is required for sections 421 and 422A to apply. Sec. 1.421-7(h), Income Tax Regs.
The second distinction arises when all the requirements of section 422A(a) are met, with the exception of the holding period requirement of section 422A(a)(1) (i.e., there has been a "disqualifying disposition"). In such a case, section 421(b) treats the shareholder as having ordinary income in the year of disposition. And in contrast to section 83(a), section 422A(c)(2) provides that in a disqualifying disposition the amount included as compensation cannot exceed the amount *647 realized over the adjusted basis. We turn now to the facts of this case to determine into which category petitioner's stock option falls. This inquiry is primarily a factual one. Date of Employment
Petitioner has not established that he was employed by Solomon Co. before February 1, 1982. Although petitioner testified that he was employed in December 1981, there is no probative evidence attesting to this and, in fact, there is persuasive evidence to the contrary. Melvin Solomon testified that he did not have the power to employ petitioner without the approval of the board of directors. He did not obtain that approval until February 1, 1982, the date of petitioner's employment contract. The minutes of the board meeting spoke only in terms of approval and not of ratification of some action taken earlier. And the employment contract itself stated that the commencement date of petitioner's employment was February 1, 1982. In fact, petitioner and Mr. Solomon initialed pen-and-ink changes, changing that commencement date from January 1982 to February 1, 1982. Petitioner did not produce any of his employment records at Solomon Co. or any other documentation or evidence that *648 would indicate an employment relationship at any earlier date. Thus, the Court finds that petitioner did not become an employee of Solomon Co. until February 1, 1982. If he was on the premises and rendered any services prior to that date, the Court concludes that he did so as an independent contractor. Date of Grant
Petitioner contends that the stock option was granted to him on December 21, 1981, presumably by Mr. Solomon's letter of that date. However, Mr. Solomon had no authority to grant stock options without board approval. Moreover, were the Court to accept petitioner's contention, we would be constrained to find that the exercise of the options was taxable under section 83 since he was not an employee at the time the option was purportedly granted. It is, however, the conclusion of the Court that what petitioner refers to as an offer was merely a statement of an intention to make an offer in the future.
Section 1.421-7(a)(1), Income Tax Regs., states: (a) Option. (1) For purposes of sections 421 through 425, the term "option" includes the *649 right or privilege of an individual to purchase stock from a corporation by virtue of an offer of the corporation continuing for a stated period of time, whether or not irrevocable, to sell such stock at a price determined under paragraph (e) of this section, such individual being under no obligation to purchase. Such right or privilege, when granted, must be evidenced in writing. * * * While no particular form of words is necessary, the written option should express, among other things, an offer to sell at the option price and the period of time during which the offer shall remain open. [Emphasis supplied.] Section 1.421-7(c)(1), Income Tax Regs., defines the date of granting an option, for the purpose of section 421, as "the date or time when the corporation completes the corporate action constituting an offer of stock for sale to an individual under the terms and conditions of a statutory option." The letter, dated December 21, 1981, from Mr. Solomon to petitioner stated, "This will confirm our understanding that we will issue you stock *650 options * * *." [Emphasis supplied.] In contrast, the employment agreement of February 1, 1982, stated, "Employer hereby grants to Employee an option to acquire * * *." [Emphasis added.] The two statements were markedly different. The statement in the letter was one of future intent. The letter was from Mr. Solomon who could not grant stock options without board approval. It did not constitute an offer by the corporation. At most, it was a summary of prior negotiations between petitioner and Mr. Solomon. Because the statement was not an offer, petitioner had no power to "accept" anything in the letter. Petitioner merely indicated his assent to the proposed offer. The employment contract, in contrast, clearly granted the option to petitioner. The employment agreement was the document approved by the board of directors and constituted the offer by the corporation. Further support for the Court's conclusion is found in Solomon Co.'s Form 10-K for its fiscal year ending January 30, 1982, which was filed with the Securities and Exchange Commission on April 30, 1982 (hereinafter the Form 10-K). The Form 10-K stated that petitioner had no outstanding stock options as of *651 January 30, 1982, and that: Subsequent to January 30, 1982, the Company granted options to purchase 105,000 shares of the Company's common stock pursuant to employment contracts to four key employees that are not included in the listing above. The options are immediately exercisable at an exercise price of $ 1.00 per share. On June 4, 1982, one employee exercised his options to purchase 50,000 shares of the Company's common stock. In addition, the Company issued 15,000 shares (9,098 new shares and 5,902 from treasury stock), at $ 1.00 per share, to one of the key employees. Therefore, the Court finds that the options were granted on February 1, 1982. Date of Exercise
Petitioner did not exercise any stock option on December 22, 1981. Based upon our finding above, he had received no stock option that he could exercise at that time. Moreover, "A promise to pay the option price does not constitute an exercise of the option unless the optionee is subject to personal liability on such promise." Sec. 1.421-7(f), Income Tax Regs. *652 Petitioner's notation, "Agreed & exercized," [sic] could not have been more than an agreement as to the proposed terms which would be later written into his employment contract. Since there was no offer, and thus no grant, there was no option for petitioner to exercise, and he had no personal liability in December of 1981. Petitioner incurred no personal liability with respect to the option price until June 4, 1982, when he paid $ 50,000 for 50,000 shares of Solomon Co. stock. Prior to that date, he was under no legal obligation, to pay Solomon Co. $ 50,000 for the exercise of a stock option. [11] Moreover, Solomon Co.'s Form 10-K stated that stock options were exercised as to only 263 shares during its fiscal year ending January 30, 1982. Thus, the Court finds that the date of exercise was June 4, 1982. *653 Type of Stock Option
The final, and most important, issue is whether Solomon Co. granted petitioner an incentive stock option or a nonqualified stock option. The parties agree that Solomon Co. had an incentive stock option plan. Thus, the existence of the plan itself is not at issue. What is at issue is the following paragraph from petitioner's employment agreement: Employer hereby grants to Employee an option to acquire up to 50,000 shares of the $ .10 par value common stock of Employer, at a price of $ 1.00 per share, exercisable at any time prior to the expiration of six months after the Termination Date (such date, six months after the Termination Date, is referred to herein as the "Option Expiration Date"), in accordance with the provisions of the Stock Option Agreement in the form annexed as Exhibit 1 hereto. Petitioner claims that this option was intended to be granted pursuant to the ISO Plan. In support of this proposition, petitioner offers his testimony and that of Melvin Solomon. Petitioner testified that he was involved extensively in the negotiation of all four employment contracts. He presumably had a great deal of expertise in business *654 and financial matters, yet he signed an employment contract that contained no mention of incentive stock options. Petitioner dismisses this fact as "an oversight in terms of nomenclature." Considering the pen-and-ink changes as to the date of this contract, the Court has some difficulty believing that petitioner, Mr. Solomon, and the entire board of directors merely overlooked this far more important matter. We also note that the letter of December 21, 1981, similarly fails to mention incentive stock options. Here neither Solomon Co. nor petitioner clearly indicated at the time of the grant under which particular stock option plan the options were granted. The Court must consider all of the facts and circumstances surrounding the grant. Petitioner contends that because the Proxy Statement and Prospectus states that 145,277 options were outstanding on May 14, 1982, petitioner must have been granted incentive stock options. Petitioner argues that if only Mr. Whalen were granted options under the ISO plan, the number of outstanding options under the 1980 Plan would be 130,277, a number in excess of the authorized total of 100,000. As noted above, however, there was at least one *655 other stock option plan that was not at issue in this case. It is entirely possible that some of these outstanding options were granted pursuant to that third plan. Moreover, there are other facts that persuade us that the option granted to petitioner was not granted under the ISO Plan. As noted above, one of the requirements for an incentive stock option is that the option price must be greater than or equal to the fair market value of the stock on the date of the grant. The option was granted on February 1, 1982. The fair market value of the stock on that date was $ 1.25 per share. The option price, as stated in the employment agreement, was $ 1 per share. That indicates that the option was not granted under the ISO Plan. The minutes of the February board meeting show that the board approved a $ 1 per share price for nonqualified options and a $ 1.25 per share price for incentive stock options. Petitioner counters that, testifying: in terms of my direct recollection of the meeting, the meeting confirmed the $ 1 per share options. This plan was intended to tie right in with those. I don't believe that the $ 1.25 was correct. I think it is a typographical error, *656 I don't know. Melvin Solomon also testified that he did not know why the minutes of the board meeting were written up that way, saying: because intent and purpose of the time was to present them as incentive stock options at the value of the date because we wanted to make sure that our employees had something to work for and forward toward, sort of like dangling a carrot in front, and I don't understand why it was written up that way. No other explanation was offered for the clear statement in the minutes. With a publicly held corporation such as Solomon Co., we will not lightly disregard the official minutes of the action taken by its board of directors. Here Solomon Co. was under the supervision of the Creditors' Committee and was also involved with an upcoming merger and tax-free reorganization under section 368(a)(1)(A). Under these circumstances, we will not say that the corporate minutes do not mean what they say. Also the stock option agreement was between petitioner and the corporation, not between petitioner and Mr. Solomon. Petitioner contends that a good faith effort was made to value the stock and that this Court should *657 accept the $ 1 per share price as the result of that effort. Petitioner's argument is based on section 422A(c)(1) which states in part: (c) Special Rules. -- (1) Good faith efforts to value stock. -- If a share of stock is transferred pursuant to the exercise by an individual of an option which would fail to qualify as an incentive stock option under subsection (b) because there was a failure in an attempt, made in good faith, to meet the requirement of subsection (b)(4), the requirement of subsection (b)(4) shall be considered to have been met. * * * Section 422A does not define "good faith effort." Nor is it mentioned in the temporary regulations promulgated pursuant to section 422A. It is, however, defined in section 1.422-2(e)(2)(ii), Income Tax Regs.: [12]
in the case of a publicly held stock which was actively traded in an established market at the time the option was granted, determining the fair market value of such stock by any reasonable *658 method using market quotations would establish that a good-faith attempt to meet the requirements of section 422(b)(4) and this paragraph was made. * * * Petitioner's assertion that Solomon Co. made a good faith attempt to value the stock, thus making $ 1 a valid price for the stock option under section 422A(b)(4), is not well taken. Again this argument ignores the unambiguous language of the minutes of the board meeting. The question of good faith valuation is a factual one, [13] and petitioner has offered no evidence on this point. The stock was publicly traded and the $ 1 per share price was not based on market quotations. The stock was publicly traded at $ 1.25 per share in February 1982. Thus, the stock *659 options at the time of grant failed to meet the requirements of section 422A that the price be not less than fair market value. Accordingly, we conclude that petitioner has not established that his stock option was granted under the ISO Plan. Therefore, the stock option will be taxed under the rules of section 83. To reflect concessions and the above holdings, Decision will be entered under Rule 155. Footnotes
1. When questioned by the Court, petitioner insisted he prepared that notation on that date (December 22, 1981), saying that it occurred on a Monday after a Sunday meeting. The Court notes that December 22, 1981, was a Tuesday.↩
2. There was also a third stock option plan that was not at issue in this case.↩
3. The date originally typed on that agreement was January 1982. Petitioner and Mr. Solomon made pen-and-ink changes in two places, changing the date to February 1, 1982. Petitioner and Mr. Solomon initialed those date changes, so that the agreement provided that it was "made as of this 1st day of February 1982" and the term of the employment was to "commence on February 1, 1982↩ (the 'Commencement Date'), and * * * continue through December 31, 1983 (the 'Termination Date') * * *."
4. There was no "Exhibit 1" annexed to the Court's copy of petitioner's employment agreement. The other three employment agreements similarly referred to such an exhibit, but no exhibits were attached to those agreements. The record does not establish whether or not an "Exhibit 1" was ever prepared or ever attached to these four employment agreements. If there was a "Stock Option Agreement," such document would be highly relevant to the issue in this case and should have been produced by petitioner.↩
5. Service Merchandise, like Solomon Co., is a general merchandise business operated through catalog showrooms.↩
6. Section 83(a) provides: SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES. (a) General Rule. -- If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of -- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forefeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. * * *↩
7. Section 1.83-7(a), Income Tax Regs., provides in part: (a) In general. * * * If section 83(a) does not apply to the grant of such an option because the option does not have a readily ascertainable fair market value at the time of grant, sections 83(a) and 83(b) shall apply at the time the option is exercised or otherwise disposed of, even though the fair market value of such option may have become readily ascertainable before such time. If the option is exercised, sections 83(a) and 83(b) apply to the transfer of property pursuant to such exercise, and the employee or independent contractor realizes compensation upon such transfer at the time and in the amount determined under section 83(a) or 83(b)↩. * * *
8. Section 421(a) provides in part: SEC. 421. GENERAL RULES. (a) Effect of Qualifying Transfer. -- If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section * * * 422A(a) * * * are met -- (1) * * * no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share; (2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation * * * with respect to the share so transferred; and (3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.↩
9. Section 422A(a) provides in part: SEC. 422A. INCENTIVE STOCK OPTIONS. (a) In General. -- Section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of an incentive stock option if -- (1) no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 1 year after the transfer of such share to him, and (2) at all times during the period beginning on the date of the granting of the option and ending on the day 3 months before the date of such exercise, such individual was an employee of * * * the corporation granting such option * * *.↩
10. Section 422A(b) provides in part: SEC. 422A. INCENTIVE STOCK OPTIONS. (b) Incentive Stock Option. -- For purposes of this part, the term "incentive stock option" means an option granted to an individual for any reason connected with his employment by a corporation, if granted by the employer corporation or its parent or subsidiary corporation, to purchase stock of any of such corporations, but only if -- (1) the option is granted pursuant to a plan which includes the aggregate number of shares which may be issued under options and the employees (or class of employees) eligible to receive options, and which is approved by the stockholders of the granting corporation within 12 months before or after the date such plan is adopted; (2) such option is granted within 10 years from the date such plan is adopted, or the date such plan is approved by the stockholders, whichever is earlier; (3) such option by its terms is not exercisable after the expiration of 10 years from the date such option is granted; (4) the option price is not less than the fair market value of the stock at the time such option is granted; (5) such option by its terms is not transferable by such individual otherwise than by will or the laws of descent and distribution, and is exercisable, during his lifetime, only by him; (6) such individual, at the time the option is granted, does not own stock possessing more than 10 percent of the total combined voting power of all classes of stock of the employer corporation or of its parent or subsidiary corporation; and * * *↩
11. At trial, other than assenting to a lengthy, leading question by his counsel, petitioner never actually testified that he exercised the options on December 22, 1981. He testified that he: wished to exercise [his] rights under those options, although the counsel for the company had told us we couldn't buy any shares because we were in the middle of merger negotiations, and it would be insider trading. Petitioner agreed that his intention was to exercise the option when he could legally do so. Regardless of petitioner's intentions, there was no option in December 1981 and he could not, and in fact did not, exercise the option at that time.↩
12. Section 422 applied to qualified stock options. Although section 422 has not been repealed, by its terms sections 422 and 421(a) do not apply to options exercised after May 20, 1981. See section 422(b)(3), (c)(7); section 1.422-2(i)(5), Income Tax Regs.↩
13. See Keogh v. Commissioner, T.C. Memo. 1990-131↩.