RICHARD A. CHILDS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15639–92, 15640–92, Filed November 14, 1994.
16256–92, 16257–92.

---

[1] Cases of the following petitioners are consolidated herewith: Mimi P. Childs, docket No. 15640–92; John C. Swearingen, Jr., and Suzanne N. Swearingen, docket No. 16256–92; and Ben P. Philips, docket No. 16257–92.

*Jacob Beil,* for petitioners in docket Nos. 15639–92 and 15640–92.

*Richard A. Childs,* for petitioner in docket No. 15640–92.

*Sylvia K. Kochler* and *Patrick G. Jones,* for petitioners in docket Nos. 16256–92 and 16257–92.

*Lourdes M. DeSantis, Amy A. Campbell,* and *Charles P. Hanfman,* for respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners Richard A. Childs' and Mimi P. Childs' income tax for the taxable years 1986 and 1987 in the amounts of $37,176.42 and $34,792.85, respectively, and additions to tax under section 6661[2] for the taxable years 1986 and 1987 in

---

[2] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

the amounts of $9,294 and $8,698, respectively. Respondent determined deficiencies in the income tax of petitioners John C. Swearingen, Jr., and Suzanne N. Swearingen for the taxable years 1986 and 1987 in the amounts of $40,977.76 and $44,952, respectively, and additions to tax under section 6661 for the taxable years 1986 and 1987 of $12,910 and $11,238, respectively. Respondent determined deficiencies in the income tax of petitioner Ben P. Philips for the taxable years 1986 and 1987 in the amounts of $41,695 and $22,610, respectively, and additions to tax for the taxable years 1986 and 1987 under section 6661 of $10,424 and $5,653, respectively.

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision: (1) Whether petitioners are required to include in income in the years here in issue, either under section 83 or by reason of constructive receipt, the value of amounts to be paid under structured settlement agreements covering future years for services rendered with respect to two related personal injury claims; and (2) if petitioners are required to include in income the fair market value of the right to receive future payments of attorney's fees in the year the agreement for such future payments was entered into, what is the amount of such fair market value.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

All petitioners resided in Columbus, Georgia, at the time of the filing of their petitions in these cases. Petitioners Richard A. Childs and Mimi P. Childs filed a joint Federal income tax return for each of the taxable years 1986 and 1987 on the cash basis of accounting. Petitioners John C. Swearingen, Jr., and Suzanne N. Swearingen filed a joint Federal income tax return for each of the years 1986 and 1987 on the cash basis of accounting, and petitioner Ben P. Philips filed an individual Federal income tax return for each of the years 1986 and 1987 on the cash basis of accounting.

Mr. Ben Philips (Mr. Philips) is a trial lawyer whose practice is largely limited to handling personal injury and products liability cases. During the tax years at issue, Mr. Rich-

ard A. Childs (Mr. Childs), Mr. Philips, and Mr. John C. Swearingen (Mr. Swearingen) engaged in the practice of law in Columbus, Georgia, as a professional corporation known as Swearingen, Childs & Philips, P.C. Mr. Childs, Mr. Philips, and Mr. Swearingen were the only shareholders of the professional corporation (the law firm).

Mr. Willie James Jones (Mr. Jones), along with his wife, Mrs. Annette Jones (Mrs. Jones), and her son, Jermeral C. Garrett (Garrett), a minor, lived near Phoenix City, Alabama, in a community called Salem. On September 21, 1984, Mr. Jones and Garrett sustained serious bodily injuries as a result of an explosion and fire caused by the accumulation of gas in the Joneses' home. On October 12, 1984, Mr. Jones died from the injuries he received from the explosion.

Mr. Jones was survived by his widow, his mother, and several brothers and sisters. Mr. Jones had no will and, therefore, his estate was distributed according to the intestacy laws of Alabama.

In the latter part of September 1984, Mr. Philips was informed of the explosion by Mr. Jones' brother, who asked Mr. Philips to investigate the situation. Mr. Philips then visited Mrs. Jones, who requested Mr. Philips and his law firm to pursue for her any possible claims against those responsible for the explosion. Within a few days, Mr. Swearingen and Mr. Childs visited the scene of the explosion to further investigate.

Pursuant to a contingency fee agreement (the Garrett fee agreement) executed on October 17, 1984, Messrs. Philips, Swearingen, and Childs (the attorneys) agreed to represent Mrs. Jones. According to the Garrett fee agreement, the law firm's representation of Mrs. Jones was for causes of action that Mrs. Jones might bring individually, on behalf of Garrett, and as administratrix of the estate of Mr. Jones. Under the agreement, if the cases were settled before trial, the fees paid to the attorneys were to be a sum equal to 33⅓ percent of the gross amounts recovered by Mrs. Jones, individually, as administratrix of the estate of Mr. Jones, and on behalf of her son, Garrett. If the cases were settled after trial, the attorneys were to receive 40 percent of the gross amounts recovered. Under the agreement, if nothing was recovered on behalf of the plaintiffs, or paid upon the claims or causes of action, the attorneys received nothing for their services ren-

dered. The agreement provided that the compensation to the attorneys was for "services already rendered and * * * to be rendered" in the actions to be brought by Mrs. Jones. Mrs. Jones agreed to bear all expenses of litigation, whether or not any amounts were recovered. The attorneys were authorized to pay out of money due Mrs. Jones any and all doctors' bills, hospital bills, other medical bills, and expenses incurred. According to the Garrett fee agreement, if, after investigation, the attorneys deemed it unwise to proceed further with the cases, the attorneys had the right to withdraw, but Mrs. Jones would not be held liable for any costs or expenses incurred if they withdrew.

The agreement expressly granted to the attorneys full and complete authority to handle the claims and file whatever legal proceedings were necessary and proper. There was no provision in the fee agreement for payment for services rendered after a settlement was concluded.

The attorneys filed personal injury claims (the claims) with Columbus Propane Gas Service, Inc. (Columbus Propane), on behalf of Mrs. Jones, as mother and next friend of Garrett, and on her own behalf for loss of services of Garrett, and for Mr. Jones' death, claiming that Columbus Propane was responsible for the explosion and resulting injuries. The liability insurance carriers for Columbus Propane were Georgia Casualty & Surety Co. (Georgia Casualty) and Stonewall Insurance Co. (Stonewall). Georgia Casualty was Columbus Propane's primary insurance carrier, with coverage up to $1 million. Stonewall was the secondary insurer, providing excess (umbrella) insurance coverage up to $10 million.

After the claims were filed, Columbus Propane notified Georgia Casualty of the claims. During the latter part of 1984, Georgia Casualty attempted to negotiate a settlement of Mrs. Jones' claims. Georgia Casualty engaged the services of Charles S. Bradford (Mr. Bradford) of Structured Annuity Settlements, Inc., to attempt to negotiate a structured settlement on its behalf with Mrs. Jones. Mr. Philips was the attorney who did most of the negotiating with Mr. Bradford. Mr. Philips initially demanded $5 million to settle the claims arising from the injuries to Garrett, and an additional $5 million to settle the claims arising from the death of Mr. Jones, for a total of $10 million. After this demand by Mr. Philips, settlement negotiations ceased.

On May 7, 1985, Garrett, acting by and through Mrs. Jones, and Mrs. Jones individually, filed a suit against Columbus Propane in the U.S. District Court for the Middle District of Georgia, Columbus Division (the Garrett litigation). The Garrett litigation was assigned Civil Action No. 85–90–COL. Neither Georgia Casualty nor Stonewall Insurance was named as a defendant in the Garrett litigation.

The attorneys prepared the complaint, interrogatories, and numerous other documents in the Garrett litigation, and they also represented Mrs. Jones in the taking of 15 depositions.

Georgia Casualty retained Lokey & Bowden, a law firm in Atlanta, Georgia, as its counsel. Mr. Glenn Frick (Mr. Frick) of Lokey & Bowden acted as lead counsel for Georgia Casualty. Stonewall retained Lord, Bissell & Brook, a law firm in Atlanta, Georgia, as its counsel.

The trial in the Garrett litigation was scheduled to commence on March 24, 1986. During March 1986, the parties to the Garrett litigation renewed settlement negotiations. On March 5, 1986, Mr. Bradford met with Mr. Philips and Mr. Childs to present a proposal for the settlement of the Garrett litigation. On March 7, 1986, in a letter to Mr. Philips, Mr. Bradford proposed a settlement which included payment of legal fees in the amount of $150,000. Mr. Philips rejected the settlement offer proposed by Mr. Bradford.

At this point, the law firm sent a letter to Messrs. Frick, Roger Sullivan, and Clifton Shepherd of Georgia Casualty, and to Mr. E.A. Anderson of Stonewall. In this letter, the position of the law firm on settlement of the Garrett litigation and wrongful death claim was set forth. The law firm, on behalf of the plaintiffs, offered to settle the Garrett litigation for $2.4 million and the wrongful death claims for $2 million. At this point, litigation had not been initiated with respect to the claim based on Mr. Jones' wrongful death. The law firm's offer as to the Garrett litigation was rejected, and there was no response as to the wrongful death claim. Soon thereafter, the law firm lowered its offer for settlement of the Garrett litigation to $2 million. After the lower offer was made, Mr. Bradford began to make proposals for settlement

based on structured payments[3] to the plaintiffs and to the attorneys for their fees.

Mr. Philips was concerned with effecting a settlement of the Garrett litigation in a manner to protect Garrett and to preserve the money received. At the time, Garrett was under 10 years old, and Mr. Philips did not consider Mrs. Jones to be qualified to protect Garrett's money.

Around the middle of March 1986, Mr. Bradford and Mr. Philips reached a tentative settlement of the Garrett litigation. This tentative settlement was a structured settlement for the payment on behalf of Garrett and also for legal fees. Since Garrett, a minor who was a resident of Alabama, was a party to the settlement, court approval of the settlement was required.

On April 25, 1986, the Circuit Court of Russell County, Alabama (the Alabama court), approved the terms of the Garrett release agreement and a second release agreement dealing with Mrs. Jones' claim for lost services. Also on April 25, 1986, the Honorable Robert Elliott, U.S. District Judge for the Middle District of Georgia, entered his order dismissing the Garrett litigation with prejudice pursuant to rule 41 of the Federal Rules of Civil Procedure.

The first release and indemnity agreement (the Garrett release agreement) was executed by Mrs. Jones, as next friend and mother of Garrett, and by Mollie Hood, as Garrett's guardian.[4] A second release and indemnity agreement (the second Garrett release agreement) was executed by Mrs. Jones. This release dealt with her claim for lost services. The Garrett release agreement and the second Garrett release agreement served to release Columbus Propane from any claims arising from damage done to or injuries sustained by Garrett because of the explosion. The releases also authorized the law firm to consent to an order dismissing the Garrett litigation.

According to the Garrett release agreement, Georgia Casualty and Stonewall would pay to Garrett a lump-sum payment of $240,469.82, along with extended structured payments. The structured payments were to be paid through the

---

[3] "Structured payments" and "structured settlements" refer to payments to be made at various times in the future.

[4] Mollie Hood was Garrett's grandmother. Because of his doubt of Mrs. Jones' ability to handle financial matters, Mr. Philips had arranged to have Mrs. Hood appointed Garrett's guardian.

purchase of annuities from Executive Life Insurance Co. (Executive Life), but neither Georgia Casualty nor Stonewall was released from its obligation to make the payments. The Garrett release agreement provided that Georgia Casualty and Stonewall, or their assignees, were the owners of any annuity policies issued to provide for the payments under the structured settlement. Georgia Casualty and Stonewall were not required to segregate or set aside specific assets to fund any of the structured payments.

The Garrett release agreement provided for a future assignment of the obligations of Georgia Casualty and Stonewall as to the structured payments in the Garrett release agreement to First Executive Corp. (First Executive), which would assume the obligations on behalf of Georgia Casualty and Stonewall without releasing the insurance companies' liability. The release agreement specifically provided—

X. If the obligation of Stonewall Insurance Company or Georgia Casualty & Surety to make periodic payments herein is assigned, then the rights and obligations of this agreement as to the assignee shall remain unchanged.

In consideration for the assumption by First Executive, Georgia Casualty and Stonewall were to deliver to First Executive a sum sufficient to purchase an annuity which would provide adequate payments to First Executive to enable it to meet the obligations assumed, plus a fee as determined by First Executive.

During negotiations of a settlement of the Garrett litigation, a proposal was discussed that would have given Garrett a structured settlement, but would not have provided specifically for the payment of legal fees. During these discussions, Mr. Philips consulted with the State Bar of Georgia to determine, if such a settlement was accepted, what amount would be allowable as legal fees, and how the attorneys might collect this amount. It was determined that if such a settlement was made, at the time it was made the attorneys would be entitled to the agreed percentage of the present value of the structured settlement. Because of the problems which would result, a decision was reached to specifically provide for the payment of the legal fees in any settlement.

The Garrett release agreement provided for the payment of legal fees to the attorneys for services in connection with the

Garrett litigation. A schedule of structured payments to the attorneys was set forth in an attachment to the release agreement, which was incorporated into the agreement. During negotiations with Mr. Bradford concerning the settlement of the Garrett litigation, several different alternatives for payment of legal fees were discussed. Mr. Bradford insisted that some portion of the legal fees be paid in a structured format, even though Mr. Philips had expressed a desire to receive his fee immediately. One factor that the attorneys considered in making a decision on how to handle payment of the legal fees was Mrs. Jones' statement that she did not want the attorneys to receive their fee immediately, if she and Garrett were to take a structured settlement. Before the negotiations resulted in an agreed settlement, the parties agreed that all of the legal fees would be paid in a structured format.[5] Each of the attorneys was given several options as to the structure of the payments to him and each made his decision from the options offered.

According to the Garrett release agreement, Mr. Philips was to be paid $52,155 on January 2, 1987, and $52,155 on January 2, 1988. Mr. Childs was to be paid $1,324.57 per month for 10 years beginning on January 2, 1987, and $6,000 per year on August 1 of 1996, 1997, 1998, and 1999. Mr. Swearingen's share of the legal fees was to be paid to him in six annual payments of $11,734.21, commencing on January 2, 1987, along with the following payments made on August 1 of the year indicated:

| Year | Amount |
| --- | --- |
| 1992 | $10,000 |
| 1993 | 10,000 |
| 1994 | 10,000 |
| 1995 | 20,000 |
| 1996 | 10,000 |
| 1997 | 10,000 |
| 1998 | 22,000 |
| 1999 | 12,000 |
| 2000 | 12,000 |
| 2001 | 12,000 |

[5] It appears that some part of the $240,469.82 cash payment was to be used for payment of medical expenses and litigation expenses, and some was to be paid to the attorneys. However, this payment is not in issue here and, in fact, the record does not show whether this payment was for attorney's fees or other uses.

Sometime after April 1, 1986, the attorneys were each named as annuitants under an annuity policy purchased by Georgia Casualty and Stonewall from Executive Life, and their respective estates were designated as primary beneficiaries. There were no contingent beneficiaries named.

According to the Garrett release agreement, if any party entitled to receive payments under the Garrett release agreement died prior to the receipt of the payment, future payments were to be made to a lawfully designated representative or beneficiary, unless the payments terminated on the death of the party under the terms of the Garrett release agreement. The Garrett release agreement also provided that neither Garrett, his guardian, his heirs, his beneficiaries, nor his assigns had the right to accelerate payments or reduce the payments to their present value.

On April 14, 1986, Mrs. Jones, Mrs. Hood as guardian for Garrett, each of the attorneys, Georgia Casualty, Stonewall, and First Executive, the parent company of Executive Life, executed an assignment and assumption agreement providing for "a qualified assignment [which] * * * meets the requirements of Section 130 of the Internal Revenue Code, as amended" of the deferred payment liability of Georgia Casualty and Stonewall to Garrett, Mrs. Jones, and the attorneys. This agreement provided that with amounts received from Georgia Casualty and Stonewall, First Executive would purchase from Executive Life annuity contracts to cover the deferred payment liabilities of Georgia Casualty and Stonewall. Petitioners were annuitants under the policies and, as such, the beneficiaries. Paragraph 5 of this agreement provided—

5. *No Right of Acceleration/Status as General Creditor.* The parties to this Agreement agree (1) that any periodic payments hereunder shall not be capable of being accelerated, deferred, increased, or decreased by Jones, Hood, Garrett or any other recipient hereunder and (2) that said persons, or any other recipient hereunder, shall not have, by reason of this Agreement, any right against First Executive other than the rights of a general creditor.

The owner of the Garrett annuities, including those under which the attorneys were annuitants, was First Executive. Each of these Garrett annuities contained a provision stating that the owner of the annuity could exercise any right or

privilege of ownership, including changing the beneficiary under the policy by written request while the beneficiary was living.

Not all of the deferred payments in the Garrett litigation have been paid on time. Executive Life has had financial troubles and has missed some payments in connection with the Garrett settlement. On such occasions, the attorneys have notified Georgia Casualty and Stonewall, and these companies have made the payments to the extent not made by Executive Life.

On September 18, 1986, Mrs. Jones, individually and as personal representative and administratrix of the Estate of Mr. Jones, brought a separate wrongful death suit against Columbus Propane in the U.S. District Court for the Middle District of Georgia, based on the death of Mr. Jones (the Jones litigation). Stonewall was not a named defendant in the Jones litigation.

In connection with the Jones litigation, the attorneys and the law firm provided legal services, including, but not limited to, filing pleadings and motions, preparing memoranda of law, requesting the production of documents, preparing interrogatories, and also representing the plaintiff in depositions.

After the attorneys had offered to settle the Jones litigation for $2 million, there was not much discussion of a settlement until around the middle of September 1987, when a jury trial in the Jones litigation had commenced. At this point, the defendants in the Jones litigation offered a settlement of $600,000, which was rejected. Even though the trial had commenced, the parties agreed that further trial be continued and settlement negotiations continued. Mrs. Jones and the law firm entered into an amended fee agreement (the Jones fee agreement) with respect to the Jones litigation, which changed the legal fees the law firm would receive if the Jones litigation went to trial from 40 percent to 45 percent. Stonewall hired Allan J. Richardson & Associates, Inc. (Richardson & Associates), and its structured settlement negotiator, James L. Gilbert, to assist in the settlement negotiations in the Jones litigation. Mr. Gilbert began to send the attorneys settlement proposals which included payment of legal fees. Mr. Gilbert never presented a proposal that provided for all of the settlement amount to be paid imme-

diately, and he always insisted that at least some part of the legal fees be paid in a structured format. He offered several options for the structured payment of attorney's fees.

In the fall of 1987, the parties in the Jones litigation reached a settlement. On November 11, 1987, Mrs. Jones, individually, and as administratrix of the estate and personal representative of Mr. Jones, along with Mr. Jones' mother and siblings, executed a release and indemnity agreement (the Jones release agreement). According to the Jones release agreement, Mrs. Jones agreed to release the claims which arose out of the death of Mr. Jones against Columbus Propane and other entities and individuals named therein. Stonewall agreed to make a lump-sum payment in the amount of $464,431 to Mrs. Jones, individually and as the administratrix and representative of the Estate of Mr. Jones, the attorneys, and the law firm.[6] Mrs. Jones' portion of the lump-sum payment was to be used to satisfy the claims of all other beneficiaries of the Estate of Mr. Jones. Stonewall also agreed to make certain structured payments to Mrs. Jones through annuities purchased from Manufacturers Life Insurance Co. (Manufacturers Life).

The Jones release agreement also provided for the payment of legal fees for the Jones litigation. Mr. Gilbert had presented the attorneys with several options as to the payment of the legal fees, each involving structured payments. Originally, the options that Mr. Gilbert presented involved long-term annuities. As he prepared the different proposals, Mr. Gilbert tried to determine each attorney's attitude toward the structured payments. According to the Jones release agreement, Mr. Philips was to receive $1,000 per month beginning on January 15, 1992, and payable thereafter each month of each year so long as Mr. Philips lived, but for 20 years certain. Mr. Philips' payments were to be compounded annually by a factor of 3 percent. Mr. Swearingen was to receive monthly payments of $1,000 for 5 years and monthly payments of $1,800 commencing on January 15, 2012, and continuing for the remainder of his life. Also, Mr. Swearingen was to receive monthly payments commencing on January 15 of the year indicated and

---

[6] This payment is not in issue in this case, nor does the record show the use of the part of the payment received by the attorneys.

continuing in each instance for 5 years thereafter (totaling 60 payments) as follows:

| Year | Amount |
|------|--------|
| 1997 | $1,200 |
| 2002 | 1,400 |
| 2007 | 1,600 |

Mr. Childs requested that he receive his part of the legal fees immediately, but that arrangement was not acceptable to Mr. Gilbert. Mr. Childs, from the alternatives offered to him, chose to receive payments of $49,000 on January 15, 1988, and $49,050 on April 15, 1988.

The Jones release agreement allowed Stonewall to assign its obligation for the structured payments under the Jones release agreement to Manulife Service Corp. (Manulife). Manulife would then become directly responsible for the structured payments, and Manufacturers Life would guarantee the structured payments. In the case of such an assignment, the Jones release agreement provided that Stonewall would remain obligated as a secondary guarantor after Manufacturers Life's guarantee. The Jones release agreement provided that no party that was to receive payments had the right to accelerate the payments or reduce the payments to their present value. As in the Garrett litigation, the attorneys agreed that their rights under the policies were no greater than those of a general creditor.

On November 11, 1987, Mrs. Jones and the attorneys signed a notice of settlement, satisfaction, and dismissal, which dismissed with prejudice all claims in the Jones litigation. On November 24, 1987, Richardson & Associates completed three applications to purchase annuities (the Jones annuities) from Manufacturers Life in order to fund the structured payments of attorney's fees to the attorneys. On December 15, 1987, Manufacturers Life issued three annuity policies with respect to payment of the structured attorney's fees to the attorneys. Each policy expressly provided that Stonewall was the owner of the policy and that, as such, it had all rights of ownership. Under the Jones annuities, the annuitants, who were the attorneys, did not have the right to assign the payments, accelerate the payments, designate the payee, change the terms or times of payments, transfer

or sell the payments, or designate a new beneficiary. Under the Swearingen policy, Stonewall retained the power to change the beneficiary. Under the Childs annuity, Stonewall had the power to change the designated payee as long as Richard Childs was living. Under the Philips annuity, Stonewall also reserved the right to change the beneficiary.

On October 14, 1987, Stonewall issued two checks. One check was payable to Manufacturers Life in the amount of $536,069. This check was to purchase the Jones annuities. The second check in the amount of $464,431 was made payable to Annette Jones, individually, and as administratrix of the Estate of Willie J. Jones, and the attorneys.

The law firm had paid all the expenses of the Garrett litigation and the Jones litigation. After the cases were settled, the law firm was reimbursed for the expenses it had paid.

Mr. Philips discussed with Mr. Bradford the tax consequences of the deferral of payment of the legal fees. Mr. Philips also discussed the tax consequences of the deferral of payment of attorney's fees with his accountant.

On their 1986 tax returns, the Swearingens, the Childses, and Mr. Philips each reported only the cash amounts received in 1986 as attorney's fees in the Garrett litigation. Petitioners reported neither any portion of the deferred payments for attorney's fees agreed to in the Garrett litigation, nor the fair market value or cost of the annuity policies purchased for these payments. On their 1987 tax returns, the Swearingens, the Childses, and Mr. Philips each reported the first structured payments received as attorney's fees from the Garrett litigation, and the cash amounts received as attorney's fees in the Jones litigation, but neither reported any portion of the deferred payments under the structured agreement in the Jones litigation, nor the fair market value or cost of the annuities purchased to provide for such deferred payments. In the notice of deficiency issued to each, the Swearingens, the Childses, and Mr. Philips, respondent determined that the fair market value of the right to receive payments under the Garrett annuities was includable in each attorney's income in 1986, and the fair market value of the right to receive payment under the Jones annuities was includable in the attorney's taxable income for 1987, under the provisions of section 83. Respondent further determined

that a portion of the amounts received from the Garrett annuities in 1987, and reported by each petitioner in 1987, was not taxable to that petitioner in 1987, since the fair market value of the Garrett annuities had been included in taxable income in 1986. In her answer, respondent alleged, in the alternative, that each of the attorneys constructively received a total fee equal to the value of the annuity purchased for him in the year the annuity was purchased.

OPINION

Section 83 [7] provides that if property is transferred to any person in connection with the performance of services, the person who performed the services is required to include in income the fair market value of such property (less any amounts which were paid for such property) in the first taxable year in which such property becomes transferable or is not subject to a substantial risk of forfeiture, whichever comes first.

Section 321(a) of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, 588, added section 83 to the Internal Revenue Code of 1954. Congressional intent in enacting section 83 "was to equate the tax treatment of restricted stock plans involving employers and employees to the tax treatment accorded other types of deferred compensation arrangements." *Centel Communications Co. v. Commissioner*, 92 T.C. 612, 628 (1989) (citing H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 254; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 500), affd. 920 F.2d 1335 (7th Cir. 1990). We have held, however, that Congress intended section 83 to apply to all restricted stock, and not merely stock transferred for less than full value by employers to employees. *Alves v. Commissioner*, 79 T.C. 864 (1982), affd. 734 F.2d 478, 481–482 (9th Cir. 1984). Also, clearly section 83 applies to property other

---

[7] SEC. 83(a). GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

    (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

    (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. * * *

than stock. See *Montelepre Systemed, Inc. v. Commissioner,* 956 F.2d 496 (5th Cir. 1992) (holding a contractual right to be section 83 property), affg. T.C. Memo. 1991–46.

Section 1.83–3(e), Income Tax Regs., provides that "the term 'property' includes real and personal property other than either money or an unfunded and unsecured promise to pay money or property in the future." Property also includes a beneficial interest in assets which are transferred or otherwise "set aside from the claims of creditors of the transferor, for example, in a trust or escrow account." Sec. 1.83–3(e), Income Tax Regs.

Since section 83 property includes real and personal property other than either money or an unfunded and unsecured promise to pay money or property in the future, it must necessarily include a promise to pay money in the future that is either secured or funded. Therefore, if the agreements to pay annuities received by petitioners in these cases are to be held to be taxable under section 83, it is necessary that in addition to the promise to pay by Georgia Casualty and Stonewall, the evidence show such promise to be either "funded" or "secured".[8]

Neither the statute nor the regulations under section 83 defines when a promise to pay is "funded". However, in other contexts, we have considered the question of when an obligation was funded. In *Sproull v. Commissioner,* 16 T.C. 244 (1951), affd. 194 F.2d 541 (6th Cir. 1952), an employer established a trust to compensate an employee for past services. The employee, or in the event of his death the employee's estate, was the sole beneficiary under the trust. In 1945, the employer distributed money to the trust to be paid out to the employee in two installments in 1946 and 1947. We held that the employee received compensation in 1945 in an amount equal to the value of the amount paid over for the employee's benefit, since the employee was the owner of the beneficial interest in the trust. We concluded that the establishment of the trust itself conferred an economic and financial benefit on the taxpayer which was properly taxable to him in the year the fund was irrevocably paid over for his benefit.

---

[8] Petitioners Swearingen and Philips argue, in the alternative, that petitioners were at most third-party beneficiaries in the Garrett settlement agreement and the Jones settlement agreement. We need not address this argument due to our holding with regard to whether the promises to pay were funded or secured.

In *Centre v. Commissioner,* 55 T.C. 16 (1970), an employment agreement between an employee and his employer entered into in 1955 required the employer to maintain an insurance policy as a means of funding the employer's obligation to make deferred compensation payments. The employer remained the owner and beneficiary of the policy until the employee terminated his employment prior to normal retirement age, unless termination was by reason of willful breach by the employee of the employment agreement. The employee terminated his employment on December 15, 1962, and in 1964 was assigned the policy pursuant to an agreement between the employee and the employer after a suit was commenced by the employee when the employer refused to voluntarily assign the policy. We held that the employee realized taxable income in 1964 when the policy was assigned to him and not when the premiums were paid by the employer. Since the employer was both the owner and the beneficiary of the policy while the premiums were being paid, we concluded that the employee did not obtain such an interest in the policy as to realize income until the policy was assigned to him.

In *Minor v. United States,* 772 F.2d 1472 (9th Cir. 1985), a physician's employer established a deferred compensation plan under which the physician would be paid for future services by a designated percentage of the fee he was entitled to receive under the fee schedule, if the physician had not participated in the plan. Each physician employee could elect to receive a percentage from 10 percent to 90 percent of the fee under the fee schedule, and the balance would go into a deferred compensation fund. To provide for the deferred compensation payments, the employer established a trust under which the employer was the settlor and beneficiary. Three of the physicians, including the plaintiff in the case involved, were trustees. The Court of Appeals for the Ninth Circuit held that since the employee had no right, title, or interest in the trust, and since the employee benefited only incidentally from the trust, the employee was not taxed on amounts paid into the trust when the trust was funded. The Court of Appeals for the Ninth Circuit pointed out that because the deferred compensation plan was not secured from the employer's creditors and was, therefore, neither nonforfeitable nor fully vested, no amount of ascertainable value had

been conferred on the employee which would cause the funds paid into the plan to be taxable to him in the year paid in.

Taken together, these cases stand for the proposition that funding occurs when no further action is required of the obligor for the trust or insurance proceeds to be distributed or distributable to the beneficiary. Only at the time when the beneficiary obtains a nonforfeitable economic or financial benefit in the trust or insurance policy is the provision for future payments secured or funded. However, if the trust or policy is subject to the rights of general creditors of the obligor, funding has not occurred. *Minor v. United States, supra.*

Under the annuity policies issued pursuant to the Garrett litigation, Georgia Casualty and Stonewall were the obligors, but the owner of the policies was First Executive. Petitioners were the annuitants and, in this sense, only the beneficiaries of the policies. First Executive had the right to change the beneficiary of the annuity by written request while that annuitant of that policy was living. Under the assignment and assumption agreement between Georgia Casualty, Stonewall, and petitioners, the parties agreed that the periodic payments could not be accelerated, deferred, increased, or decreased by the recipients of the payments. Under this assignment and assumption agreement, petitioners agreed that they were to have no rights against First Executive other than the rights of a general creditor. Since petitioners did not own the policies, and since First Executive had the right to change the annuitant or beneficiary of each policy without the consent of the annuitant, the promises to pay petitioners under the Garrett litigation structured agreement were not funded promises by the obligors, Georgia Casualty and Stonewall.

In the Jones litigation, the owner of each of the policies was Stonewall. Stonewall maintained the right to change the beneficiary under each of the policies in which Swearingen, Philips, and Childs were the annuitants. Also, petitioners agreed that they did not have the right to accelerate, defer, increase, or decrease the periodic payments. They further agreed that their rights under the assignment and assumption agreement were no greater than the rights of a general creditor. Petitioners were neither the owners nor were they irrevocable beneficiaries under the policies, and so these annuities were unfunded.

For many of the reasons discussed above, we hold that the promises to pay were not secured. Petitioners argue that the promises were not secured since they were not granted a security interest in the property respondent contends was securing the obligation, because they were granted no rights in the property itself. Respondent argues that the guarantees by the insurance companies, Georgia Casualty, Stonewall, and First Executive, caused the promises to be secured. Respondent also argues that the fact that the insurance companies were required to maintain adequate reserves caused the promises to pay to be secured. Further, respondent argues that these promises were secured since under Georgia law attorneys have a lien superior to all other liens, except tax liens on actions, judgments, and decrees for money.

It is well settled that a simple guarantee does not make a promise secured, since by definition a guarantee is merely itself a promise to pay. *Berry v. United States,* 760 F.2d 85 (4th Cir. 1985), affg. per curiam 593 F. Supp. 80, 85 (M.D.N.C. 1984); *Brand v. Commissioner,* 81 T.C. 821, 828 (1983). Therefore, the mere fact that several insurance companies guaranteed the payments to petitioners is irrelevant to our determination of whether petitioners' right to receive the future payments was secured. Also, we are not persuaded by respondent's argument that the attorneys' claims were secured since such claims are superior to all other claims under Georgia law, except tax liens. Assuming respondent is correct as to the superiority of attorneys' claims, such superiority is not equivalent to property's being set aside as security for the annuities.[9] The contracts for structured payments were themselves payment for the attorney's fees, so the attorneys no longer had a lien for services.

---

[9] Under Georgia law, an attorney's lien attaches upon actions, judgments, and decrees for money. Ga. Code Ann. 15–19–14 (Michie 1990). This lien attaches to the fruits of labor and skill of the attorney, whether realized by judgment or decree, or by virtue of an award, or in any other way, as long as they are the result of his execution. *Thomas v. Travelers Ins. Co.,* 185 S.E. 922 (Ga. Ct. App. 1936); *Camp v. U.S. Fidelity & Guaranty Co.,* 157 S.E. 209, 210 (Ga. Ct. App. 1931). Thus, under Georgia law, insurance proceeds deposited in escrow from a procured settlement were held to fall within the meaning of this language. *John J. Woodside Co. v. Irwin,* 53 S.E.2d 246 (Ga. Ct. App. 1949). However, in the instant cases, by agreement the attorneys accepted a structured settlement for payment of their fees with specific provisions as to payment. Therefore, the attorneys had been paid by the contractual agreement and had no attorney's liens to be enforced.

Even though the insurance companies were required to maintain adequate reserves for all policy holders, this is not equivalent to specific property securing the annuities being set aside.

From the facts of these cases, we conclude that the promises to pay were neither funded nor secured. This is evident from the fact that if Executive Life or First Executive were to be placed into conservatorship, the payments to the annuitants would not have been guaranteed by any specific fund or property.[10] Thus, no property secured the promises to pay the future amounts due petitioners under the Garrett agreement.

The promises to pay under the Jones agreement were also unsecured. In the assignment and assumption agreement, the parties agreed that petitioners had no greater rights than those of a general creditor.

Since we have concluded that the agreements by Georgia Casualty and Stonewall to pay petitioners in the future were unfunded and unsecured promises to pay money in the future, these agreements were not property within the meaning of section 83. Therefore, no amount that represents the value of the future payments is includable in income of any petitioner under section 83 in the year the promises were received.

Respondent contends that if we conclude that the value of the right to future payments which petitioners received is not income taxable to petitioners under section 83, petitioners should be held to have constructively received the amounts paid for the annuity contracts in the years the annuities were purchased. Respondent raised this issue by amended answer. The parties disagree as to whether respondent or petitioners have the burden of proof on this issue. However, we do not reach this question, since under the proven facts in these cases we conclude petitioners did not constructively receive the amounts paid for the annuity contracts in the year of the purchase of those contracts.

---

[10] In fact, Executive Life was placed into conservatorship on Apr. 11, 1991, at which time payments to petitioners were limited to 70 percent of the periodic payments payable to them. Mr. Swearingen received the first five structured payments due under the Executive Life annuity contract in 1991, but only received 70 percent of the sixth payment from Executive Life. Though the shortfall was paid by Georgia Casualty, it is clear that the annuity policy owned by First Executive did not fully secure the promise between the obligors, Georgia Casualty and Stonewall, and, the obligees, petitioners Swearingen, Philips, and Childs.

Section 451(a) provides that the amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for in a different period. Under section 1.451–2(a), Income Tax Regs., income is constructively received by a taxpayer in the taxable year in which such income is credited to the taxpayer's account, is set apart for the taxpayer, or is otherwise made available so that the taxpayer could have drawn upon it during the taxable year if notice of intention to withdraw had been given. Income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

"Under the constructive-receipt doctrine, a taxpayer recognizes income when the taxpayer has an unqualified, vested right to receive immediate payment." *Martin v. Commissioner,* 96 T.C. 814, 823 (1991). Generally, there must be an amount that is immediately due and owing that the obligor is ready, willing, and able to pay. The amount owed must either be credited to the taxpayer or set aside for the taxpayer so that the taxpayer has an unrestricted right to receive it immediately, and the taxpayer being aware of these facts, declines to accept the payment. The doctrine of constructive receipt is essentially a question of fact. *Avery v. Commissioner,* 292 U.S. 210, 215 (1934).

Under the original fee agreement dated October 17, 1984, between petitioners and Mrs. Jones, both as next friend of Garrett and as administratrix of Mr. Jones' estate, petitioners were to receive 33 ⅓ percent of the gross amount recovered in the litigation if the case was settled before the suit was tried, and 40 percent of any gross amount recovered if the case was settled after the suit was tried. "Recovered" implies amounts that petitioners' clients actually received, rather than amounts that petitioners' clients had a right to receive. Petitioners' clients recovered no money from the litigation until after April 25, 1986, the date of the judgment in the Garrett litigation approving the Garrett release agreement. Under the Garrett release agreement, petitioners were to receive structured payments. Petitioners were not entitled to their fees until recovery by their clients, so their right to receive payment arose only after settlement or disposition of

the case. Thus, for the Garrett litigation, petitioners did not become entitled to their attorney's fees until the judgment was entered, by which time the structured settlements had been agreed upon.

Likewise, in the Jones litigation, petitioners had no right to receive payment until the settlement was effected on November 11, 1987, by which time the parties had agreed upon payment of attorney's fees in installments. The right of petitioners to receive payment of fees existed only after the Jones release agreement became effective, since any rights arising from the fee agreement were dependent on amounts recovered for petitioners' clients. Petitioners had no right to receive any moneys prior to such time as their clients "recovered" amounts from their claims. Petitioners never had the right to receive immediate payment, and no fund or property was set aside for petitioners which they could draw from at a time of their choosing. Because each of the deferred payment agreements was binding between the parties and was made prior to the time when petitioners acquired an absolute and unconditional right to receive payment, petitioners, who were on a cash basis, were not required to report the proceeds as income until actually received. *Oates v. Commissioner,* 18 T.C. 570, 584–585 (1952), affd. 207 F.2d 711 (7th Cir. 1953); *Amend v. Commissioner,* 13 T.C. 178, 185 (1949).

Most of the cases we discuss in connection with the meaning of "funded" or "secured" as used in section 83 deal at least in part with questions of constructive receipt. From the holdings in those cases, and for the same reason we concluded that the promises to pay were not "funded" or "secured", it is clear that petitioners did not constructively receive their attorney's fees for each case in the year that case was settled. In the year each structured fee agreement was entered into, there was no money or property available at petitioners' unfettered demand from that structured fee agreement.

We hold that petitioners did not constructively receive the fees which were the subject of the structured fee agreements until payments of the amounts in accordance with those agreements. Therefore, we do not reach the issue of the fair market value of petitioners' right to receive payments for attorney's fees in future years.

656

Because of issues settled by the parties,

*Decisions will be entered under Rule 155.*